James S. Lowrie
    jlowrie@joneswaldo.com
Andrew G. Deiss
    adeiss@joneswaldo.com
Billie J. Siddoway (ISB #6628)
    bsiddoway@joneswaldo.com
JONES WALDO HOLBROOK & MCDONOUGH PC
170 South Main St., Suite 1500
Salt Lake City, UT 84101
Telephone: (801) 521-3200
Facsimile: (801) 328-0537

Donald M. Barnes
    dbarnes@porterwright.com
Salvatore A. Romano
    sromano@porterwright.com
PORTER WRIGHT
1919 Pennsylvania Ave, N.W., Ste 500
Washington, D.C. 20006
Telephone: (202) 778-3056
Facsimile: (202) 778-3063

Steven B. Andersen (ISB #2618)
    sandersen@hollandhart.com
HOLLAND & HART LLP
101 S Capital Boulevard, Suite 1400
Boise, ID 83701-2527
Telephone: (208) 342-5000
Facsimile: (208) 343-8869

James E. Hartley
    jhartley@hollandhart.com
HOLLAND & HART LLP
555 Seventeenth St., Suite 3200
Denver, CO 80201-8749
Telephone: (303) 295-8000
Facsimile: (303-295-8261

Stephen V. Bomse
    sbomse@orrick.com
Robert A. Rosenfeld
    rrosenfeld@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard St.
San Francisco, CA 94105-2669
Telephone: (415) 773-4190
Facsimile: (415) 773-5759

Monte N. Stewart (ISB #8129)
    stewart@belnaplaw.com
Daniel W. Bower (ISB #7204)
    dbower@belnaplaw.com
BELNAP, STEWART, TAYLOR & MORRIS
12550 W Explorer Dr. Ste, 100
Boise, ID 83713
Telephone: (208) 345-3333
Facsimile: (208) 345-4461

Represented parties are identified on
the signature page. ID.Civ.R. 5.2.

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE: FRESH AND PROCESS POTATOES ANTITRUST LITIGATION | : : : | Case No. 4:10-md-02186-BLW |
| THIS DOCUMENT RELATES TO: *Brigiotta's v. United Potato Growers of Idaho, Inc., et al.* | : : : : : : : : : | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BASED ON THE CAPPER-VOLSTEAD ACT AND RELATED STATUTES** Case No. 4:10-cv-307 |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................2

II.  PLAINTIFFS' ALLEGATIONS .........................................................4

    A.   PARTIES .....................................................................................4

    B.   THE CORE ALLEGATION: OUTPUT LIMITATIONS .....................5

    C.   CAPPER-VOLSTEAD ALLEGATIONS ..............................................7

III. LEGAL STANDARD............................................................................9

IV.  SUPPLY MANAGEMENT AGREEMENTS ADOPTED AND IMPLEMENTED
    BY AGRICULTURAL COOPERATIVES AND THEIR MEMBERS ARE
    SHIELDED FROM ANTITRUST LIABILITY AS A MATTER OF LAW ......................10

    A.   THE STATUTORY BASES OF THE CAPPER-VOLSTEAD
        PROTECTIONS. ..........................................................................12

    B.   THE STATUTORY PROTECTIONS ALLOW COOPERATIVES AND
        THEIR MEMBERS TO AGREE TO FIX PRICES AND LIMIT
        OUTPUT....................................................................................14

        1.   PRICE-FIXING IS PROTECTED BY THE CAPPER-
           VOLSTEAD ACT. ................................................................14

        2.   AGREEMENTS LIMITING SUPPLY ARE PROTECTED BY
           THE CAPPER-VOLSTEAD ACT. .........................................15

           a.   PRICE-FIXING AND OUTPUT RESTRICTIONS ARE
               TWO SIDES OF THE SAME COIN...............................15

           b.   THE LEGISLATIVE HISTORY RECOGNIZES SUPPLY
               RESTRICTION...........................................................16

           c.   CASES INTERPRETING THE CAPPER-VOLSTEAD
               ACT HAVE ACKNOWLEDGED THAT RESTRICTIONS
               ON SUPPLY ARE PERMISSIBLE. ...............................19

V.   PLAINTIFFS HAVE ALLEGED NO SET OF FACTS SUFFICIENT TO
    DEPRIVE DEFENDANTS OF THE PROTECTIONS OF THE CAPPER-
    VOLSTEAD ACT ............................................................................23

A.      THE DEFENDANT COOPERATIVES ARE LEGITIMATE CO-OPS UNDER THE CAPPER-VOLSTEAD ACT ...........................................................24

B.      THE CAPPER-VOLSTEAD ACT PROTECTS COOPERATIVES THAT INCLUDE AS MEMBERS VERTICALLY INTEGRATED PRODUCERS ......................................................................................26

C.      THE AMENDED COMPLAINTS DO NOT ALLEGE THAT THE COOPERATIVES HAVE ENGAGED IN A FORM OF PREDATORY CONDUCT THAT WOULD ELIMINATE THE PROTECTION OF THE CAPPER-VOLSTEAD ACT ...................................................................28

D.      PLAINTIFFS' ALLEGATIONS THAT DEFENDANTS CONSPIRED WITH VARIOUS THIRD PARTIES ARE INSUFFICIENT AS A MATTER OF LAW OR IMPLAUSIBLE ................................................31

      1.      AGREEMENTS AMONG COOPERATIVES ARE PROTECTED ........31

      2.      PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED THAT UPGA AND ITS MEMBERS UNLAWFULLY COLLUDED WITH NONMEMBER POTATO GROWERS..........................................34

      3.      AGREEMENTS BETWEEN UPGA AND FOREIGN GROWERS DO NOT DESTROY THE CAPPER-VOLSTEAD PROTECTIONS ......................................................................36

      4.      PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED THAT UPGA AND ITS MEMBERS UNLAWFULLY COLLUDED WITH NON-EXEMPT "PARTNERS" .......................................................37

      5.      PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED THAT UPGA AND ITS MEMBERS UNLAWFULLY COLLUDED WITH NON-EXEMPT THIRD PARTIES................................................38

VI.   CONCLUSION....................................................................................................39

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Alexander v. National Farmers Organization*, 687 F.2d 1173 (8th Cir. 1982) ...................... 19

*Ashcroft v. Iqbal*, ___ U.S. ___ , 129 S. Ct. 1937 (2009) ................................. *passim*

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985) ........................... 30

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1990) ..................................... 9, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... *passim*

*Bergjans Farm Dairy v. Sanitary Milk Producers*, 241 F. Supp. 476 (E.D. Mo. 1965),
    *aff'd*, 368 F.2d 679 (8th Cir. 1966) ................................................................. 29

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993) ............... 16

*Bybee Farms, LLC v. Snake River Sugar Co.*, 563 F. Supp. 2d 1184 (E.D. Wash.
    2008) ................................................................................................. 31

*Cablevision Sys. Corp. v. FCC,* 597 F.3d 1306 (D.C. Cir. 2010) ........................................ 38

*Case-Swayne Co. v. Sunkist Growers, Inc.*, 355 F. Supp. 408 (C.D. Cal. 1971).................... 28

*Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384 (1967) ......................................... 28

*Chicago Professional Sports, Ltd. v. NBA*, 95 F.3d 593 (7th Cir. 1996)................................. 16

*Ewald Bros., Inc. v. Mid-America Dairymen, Inc.*, 877 F.2d 1384 (8th Cir. 1989) .............. 22

*Fairdale Farms Inc. v. Yankee Milk, Inc.*, 715 F.2d 30 (2d Cir. 1983) ........................... 22, 30

*Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980) ...................... 14, 26

*Farmland Dairies, Inc. v. New York Farm Bureau, Inc.*, Nos. 87-CV-1622 (FJS), 89-
    CV-567 (FJS) 1996 WL 191971 (N.D.N.Y. Apr. 15, 1996) ........................................... 30

*Federal Trade Commission v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411
    (1990) ................................................................................................. 16

*General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,* 744 F.2d 588 (7th Cir. 1984).......... 16

*GVF Cannery v. Cal. Tomato Growers Ass'n,* 511 F. Supp. 711 (N.D. Cal. 1981)......... 29, 33

*Holly Sugar Corp. v. Goshen Cty. Cooperative Beet Growers Ass'n*, 725 F.2d 564
    (10th Cir. 1986)......................................................................................... 21

*In re Elevator Antitrust Litig.,* 502 F.3d 47 (2d Cir. 2007)................................................... 35

*In re Graphics Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011 (N.D. Cal.
    2007) ................................................................................................. 36

*In re Hawaiian & Guamanian Cabotage Antitrust Lit.,* 647 F. Supp. 2d 1250 (W.D. Wa. 2009)............................................................................................................... 35, 36

*In re Southeastern Milk Antitrust Litig.,* 555 F. Supp. 2d 934 (E.D. Tenn. 2008) ................ 36

*In the Matter of Washington Crab Association, et al.,* 66 F.T.C. 45, 1974 WL 73029 (1964)............................................................................................................... 19, 30

*Jones v. Bock,* 549 U.S. 199 (2007)................................................................................................ 9

*Kendall v. VISA U.S.A. Inc.,* 518 F.3d 1042  (9th Cir. 2008) ............................................ 9, 35

*Kinnett Dairies, Inv. v. Dairymen, Inc.,* 512 F. Supp. 608 (M.D. Ga. 1981)......................... 22

*Maryland and Virginia Milk Producers Assoc., Inc. v. United States*, 362 U.S. 458 (1960) .............................................................................................................. *passim*

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009) ...................................................... 10

*N.C.A.A. v. Board of Regents,* 468 U.S. 85 (1984) ............................................................... 16

*National Broiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978) ...................... 10, 11

*Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Coop.*, 413 F. Supp. 984 (N.D. Cal. 1976), *aff'd*, 580 F.2d 369 (9th Cir. 1978)............................. *passim*

*Northland Cranberries, Inc. v. Ocean Spray Cranberries, Inc.,* 382 F. Supp. 2d 221 (D. Mass. 2004)................................................................................................. 37

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) ........................................ 10

*Sunkist Growers, Inc. v. Winkler & Smith Citrus Products Co*., 370 U.S. 19 (1962) ...... 32, 33

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc*., 497 F.2d 203 (9th Cir. 1974) ..................................................................................................... *passim*

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000)....................................................... 16

**STATE CASES**

*Luft Farms, LLC v. Western Sugar Cooperative*, 2009 WL 426240 (D. Col. Feb. 20, 2009) ........................................................................................................... 31

*United Dairymen of Arizona v. Schugg*, 128 P.3d 756 (Ct. App. Ariz. 2006)....................... 22

**FEDERAL STATUTES**

Agricultural Marketing Act of 1929 (12 U.S.C. § 1141)....................................................... 13

Capper-Volstead Act (7 U.S.C. § 291) ........................................................................... *passim*

Clayton Act of 1914 (15 U.S.C. § 17) ................................................................. 10, 11, 12, 22

Cooperative Marketing Act of 1926 (7 U.S.C. § 455)................................................ 12, 13, 31

Fisherman's Collective Marketing Act (15 U.S.C. § 521) .................................................... 20

Sherman Act, Section 1 (15 U.S.C. § 1) ............................................................ 32

Sherman Act, Section 2 (15 U.S.C. § 2) ...................................................... 29, 32

**FEDERAL RULES**

Federal Rules of Civil Procedure, Rule 12 ............................................... 4, 9, 23

Federal Rules of Civil Procedure, Rule 8 ............................................................ 9

**OTHER AUTHORITIES**

59 Cong. Rec. 7852 (1920) ................................................................................. 27

60 Cong. Rec. 312 (1920) ................................................................................... 18

61 Cong. Rec. 1033 (1921) ................................................................................. 17

62 Cong. Rec. 2057 (1922) ................................................................................. 17

62 Cong. Rec. 2058 (1922) ................................................................................. 18

62 Cong. Rec. 2121 (1922) ................................................................................. 27

62 Cong. Rec. 2163 (1922) ................................................................................. 27

62 Cong. Rec. 2225 (1922) ................................................................................. 17

62 Cong. Rec. 2262 (1922) ................................................................................. 18

62 Cong. Rec. 2277 (1922) ................................................................................. 18

67 Cong. Rec. 2775 (1926) ................................................................................. 14

AMERICAN BAR ASSOCIATION, 1 ANTITRUST LAW DEVELOPMENTS 86 (6th ed. 2007) ........... 15

Christine A. Varney, *The Capper-Volstead Act, Agricultural Cooperatives, and Antitrust Immunity,* THE ANTITRUST SOURCE (December, 2010), *at* http://www.antitrust source.com .......................................................... 20, 22

D. CARLTON AND J. PERLOFF,  MODERN INDUSTRIAL ORGANIZATION (4th ed.) 124 .............. 15

XI HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1901d, at p. 187 (1998) ................................. 15

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendants United Potato Growers of Idaho, Inc.; United Potato Growers of America, Inc.; United II Potato Growers of Idaho, Inc.; Albert Wada; Wada Farms, Inc.; Wada Farms Potatoes, Inc.; Wada-Van Orden Potatoes, Inc.; Wada Farms Marketing Group, LLC; Blaine Larsen; Blaine Larsen Farms, Inc.; Michael Cranney; Keith Cornelison; Cornelison Farms, Inc.; Snake River Plains Potatoes, Inc.; Driscoll Potatoes, Inc.; Lance Funk; Raybould Brothers Farms, LLC; and Rigby Produce, Inc. (collectively "defendants"), respectfully submit this memorandum in support of their *Motion to Dismiss Based on the Capper-Volstead Act and Related Statutes*.

This motion and supporting memorandum are filed pursuant to the Court's order that "[f]or each complaint, Defendants may collectively file a joint dispositive motion with supporting memorandum not to exceed 50 pages."  (MDL Doc. 60).  This motion is directed to the amended complaint filed by the direct purchaser plaintiffs, and argues that the claims asserted by the direct purchaser plaintiffs are barred by the Capper-Volstead Act and related statutes.

Consistent with the Court's order, defendants also are filing a joint motion and supporting memorandum seeking the dismissal of the amended complaint filed by the indirect purchasers on two grounds:  (1) the Capper-Volstead Act and related statutes pre-empt the state antitrust claims asserted by the indirect purchasers; and (2) the indirect plaintiffs lack standing to pursue the claims asserted in this case.

Recognizing that the Capper-Volstead argument in the present motion applies equally to the federal antitrust claims asserted by the indirect purchasers, the Capper-Volstead argument set forth below is incorporated by reference in the motion to dismiss the indirect purchaser

complaint.  To that end, for the Court's convenience, pertinent cites to the indirect purchaser complaint are included in this brief.[1]

## I.    INTRODUCTION

Despite their imposing length and provocative – though wholly conclusory – rhetoric, the amended complaints make essentially two points:  First, plaintiffs assert that it is impermissible for potato growers in Idaho to agree to restrict the quantity of potatoes they produce and market. Second, plaintiffs claim that even if such agreements might otherwise be lawful, defendants have engaged in various activities that deprive them of the protections afforded to agricultural cooperatives under federal and state law.

Neither of these arguments is legally sufficient, and both the direct and indirect purchaser complaints should be dismissed.  The first argument – that is the unquestioned centerpiece of plaintiffs' antitrust attack – presents a pure question of law that can be determined with finality on a motion to dismiss under Rule 12(b)(6).

Moreover, resolution of this central legal issue does not present a difficult question.  The very purpose of the Capper-Volstead Act is to permit the members of agricultural cooperatives to act as a single economic enterprise with regard to the core functions of agricultural production and marketing.  It makes no difference whether those functions are exercised through a direct agreement on price or by means of its economic equivalent, a limitation on output.  In either case, controlling federal law and policy insulate the agreements, and the steps taken to enforce them, from attack under federal and state law.

---

[1]   The amended complaint filed by the direct purchaser plaintiff (Brigotta's Farmland Produce and Garden Center, Inc.) is Doc. 39 (the consolidated amended complaint filed by the indirect purchaser plaintiffs is Doc. 63 (the "IP Compl.") (together, the "complaints").

Plaintiffs' second argument is that the protections of the Capper-Volstead Act do not apply because the defendants have entered into agreements with various third parties. These claims fare no better under Rule 12. Certain of the alleged agreements are permissible as a matter of law and can be conclusively resolved on this motion. The remaining alleged agreements are pled in a wholly conclusory and generalized fashion and fail to meet the requirements imposed by *Twombly* and *Iqbal.*

Accordingly, this motion presents a unique opportunity for the Court to dispose of the entire case at an early stage, before the defendants are forced to incur the crippling expense and disruption of extensive discovery, and the heavy burden created by this litigation.

This memorandum proceeds as follows:

- Section II summarizes the factual allegations of the complaints;

- Section III sets forth the pertinent (and familiar) legal standards applicable to the resolution of this motion;

- Section IV addresses the application of the federal statutory protections afforded to agricultural coops, demonstrating that they apply, as a matter of law, to the core alleged agreement to limit supply upon which both amended complaints are based;

- Finally, Section V, explains that plaintiffs have failed to allege facts sufficient to deprive defendants of the protections of the statutory rights otherwise available to them either because the allegedly disqualifying conduct identified by plaintiffs is unavailing as a matter of law or, in certain instances, because the challenged conduct is alleged in terms that

are conclusory and do not meet the pleading standards of *Twombly* and *Iqbal.*

Based upon this analysis, both the direct and indirect purchaser complaints are legally deficient and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  While the Court may elect to afford plaintiffs the opportunity to attempt to remedy the defects in their pleadings that arise under *Twombly* and *Iqbal*, defendants submit that the Court can address and resolve definitively the overarching questions in this case that present pure issues of law, thereby significantly narrowing the matters that may be addressed in any subsequent amended pleading.

## II.   PLAINTIFFS' ALLEGATIONS

### A.   **Parties**.

The plaintiffs are a single company that claims to have purchased potatoes directly from one or more of the defendants,[2] and a series of persons or entities that allege that they have "indirectly" purchased potatoes from one or more defendants.[3]

As alleged in the complaints, the defendants fall into several categories.

*Growers*.  The plaintiffs allege that defendants Wada Farms, Inc., Wada Farms Potatoes, Inc., Wada-Van Orden Potatoes, Inc., Wada Farms Marketing Group, LLC, Albert Wada, Blaine Larsen, Blaine Larson Farms, Inc., Michael Cranney (Cranney Farms), Keith Cornelison, Cornelison Farms, Inc., Snake River Plains Potatoes, Inc., Driscoll Potatoes, Inc., Lance Funk

---

[2]   DP Compl. at ¶ 11.
[3]   IP Compl. at p. 1 and ¶¶ 11, 15-28.

(Lance Funk Farms), Rigby Produce, Inc., Pleasant Valley Potato, Inc., Raybould Brothers Farms LLC, and RD Offutt Co. are potato growers and related companies.[4]

*Potato Grower Cooperatives and Related Organizations*.  According to plaintiffs, defendants United Potato Growers of America, Inc., United Potato Growers of Idaho, Inc., United II Potato Growers of Idaho, Inc., United Potato Growers of Canada, and Prince Edward Island Potato Board are potato cooperatives or related organizations of potato growers.[5]

*Other Parties*.  Defendants Dole Fresh Vegetables, Inc., Dole Food Company, Inc., Potandon Produce LLC, General Mills, Inc., and Idahoan Foods, LLC are other parties that allegedly dealt in various ways with the growers and potato cooperatives.[6]  Bayer CropScience LP was identified as a defendant in the original complaints filed in this litigation, but is not named in the amended complaints filed on behalf of the direct and indirect purchasers.  Both amended complaints, however, continue to identify Bayer CropScience as an alleged co-conspirator and participant in UPGA's Potato Partners program.[7]

### B.     The Core Allegation: Output Limitations.

Despite their length and frequently colorful rhetoric, the essential allegation of both the direct and indirect purchaser complaints is that defendants agreed to reduce the supply of potatoes for the purpose of raising prices.  Plaintiffs assert that the defendants engaged in an

---

4   DP Compl. at ¶¶ 30-34, 45, 67-68, 91-92, 94-95, 97-98, 100-01, 103-04, 106-07, 109-10, 112-13, 115-16.  *See also* IP Compl. at ¶¶ 61-66, 68, 80, 82, 94-95, 99, 101, 104, 106, 108, 110, 112, 114-15, 117, 119, 121, 123, 125, 127, 129.

5   DP Compl. at ¶¶ 12-14, 19-20, 27-28; IP Compl. at ¶¶ 33, 38, 44, 46, 51-52, 56-58.  United Potato Growers of Canada and Prince Edward Island Potato Board are named as defendants only in the indirect purchaser cases.

6   DP Compl. at ¶¶ 52-56, 58-61, 71-74, 81-83, 119-20; IP Compl. at ¶¶ 86, 88, 132, 134, 138-40, 146, 148, 153-54.

7   DP Compl. at ¶¶ 128-32; IP Compl. at ¶¶ 159-62.

"overarching agreement to manage the supply of potatoes in the United States for the purpose of elevating the sales price of fresh and process potatoes."[8]  Plaintiffs further claim that the defendants implemented this alleged conspiracy by "1) agreeing to limit potato planting acreages; 2) agreeing to pay farmers to destroy existing stocks or not to grow additional potatoes; 3) and agreeing to reduce the overall number of potatoes available for sale to direct-purchaser entities."[9]

Specifically, plaintiffs assert that, beginning in or about 2003-04, potato growers in Idaho formed UPGI, and that those growers, along with potato farmers in several other states, established UPGA as an umbrella group -- in effect, a cooperative-of-cooperatives.  According to plaintiffs, the purpose of these cooperatives was to increase the price of potatoes through imposition of a system of supply management, which was intended to reduce potato production thereby leading to higher prices for potatoes.[10]

Given this singular focus, it is not surprising that the plaintiffs' allegations amount to little more than an assertion that UPGI and UPGA adopted an output reduction program, took steps to implement that program and, thereafter, touted its success.  Thus, plaintiffs allege such things as the following:

- "In 2003, several Idaho growers agreed to implement acreage reductions in order to reduce supplies."  DP Compl. at ¶ 162; *see also* IP Compl. at ¶ 200.

- United Potato Growers of Idaho ("UPGI") was formed in 2004 "with the explicit goal of reducing potato supplies through various means."  DP Compl. at ¶ 168; IP Compl. at ¶ 206.

---

8    DP Compl. at ¶ 2.  *See also* IP Compl. at ¶ 3.

9    DP Compl. at ¶ 2.

10   *Cf*. DP Compl. at ¶ 3; IP Compl. at ¶ 3.

- "To achieve its supply reduction objectives, the UPGI developed and started enforcing a set of programs and policies that targeted both production and marketing of fresh potatoes."  DP Compl. at ¶ 183; IP Compl. at ¶ 221.

- United Potato Growers of America ("UPGA") also was formed in 2005 to "coordinate the supply restrictions . . . across the country and North America.  DP Compl. at ¶ 193; *see also* IP Compl. at ¶ 232.

- UPGA sought to reduce the supply of potatoes through various means, including an acreage buy-down program and an acreage reduction program.  DP Compl. at ¶¶ 201, 228; *see also* IP Compl. at ¶¶ 236, 254.

- Strict compliance with the supply reduction program was ensured through audits, GPS aerial photography and satellite imaging.  DP Compl. at ¶ 218; *see also* IP Compl. at ¶ 246.

- "UPGA and UPGI specifically sought out and allowed non-members to participate in their acreage reduction programs."  DP Compl. at ¶ 284; *see also* IP Compl. at ¶ 300.

- UPGI "colluded with numerous third parties in seeking to control Idaho and national potato acreage."  DP Compl. at ¶ 277; IP Compl. at ¶ 294.

In sum, plaintiffs allege that defendants' supply reduction program, including "acreage restrictions, acreage buy-downs, and flow control measures caused potato prices to be fixed, raised, maintained, and/or stabilized."[11]

C.      **Capper-Volstead Allegations**.

Yet, plaintiffs also recognize that the Capper-Volstead Act and related statutes[12] shield many of the activities of agricultural cooperatives and their members from the antitrust laws.[13]

---

[11] DP Compl. at ¶ 243; *see also* IP Compl. at ¶ 3.

[12] The Capper-Volstead Act and related statutes are referred to collectively as "Capper-Volstead" or the "Capper-Volstead Act," except where otherwise indicated.

[13] DP Compl. at ¶ 2.  *See also* IP Compl. at ¶ 4.

In an attempt to avoid the protections afforded by the Capper-Volstead Act, plaintiffs allege that defendants are not entitled to the protection of Capper-Volstead for the following reasons:

- "UPGA and its members (including UPGI and the other member cooperatives) are not legitimate cooperatives and they do not market, process or sell potatoes;"

- "UPGA and its members are made up of vertically integrated producers that are also packers and shippers, allegedly, in violation of the Capper-Volstead Act;"

- UPGA and its members engage in "predatory conduct;"

- "UPGA and its members, and co-conspirators have conspired and colluded with third parties to reduce supply and fix prices;"

- "UPGA, its members, and co-conspirators have conspired and colluded with non-member potato farmers to reduce supply and fix prices;"

- "UPGA, its members, and co-conspirators have conspired and colluded with foreign entities, including the United Potato Growers of Canada and Potato Marketing Association of North America, in an attempt to reduce supply and fix prices for the North American continent;"

- "UPGA, its members, and co-conspirators have conspired and colluded with non-member 'partners' who are not engaged in agricultural production and who have funded potato supply control efforts; and"

- "UPGA, its members, and co-conspirators have conspired with 'United II' – a non-grower, vertically integrated potato purchaser, to assist with supply-restriction efforts."[14]

As shown below, the claims that defendants' conduct is not protected by the Capper-Volstead Act are either incorrect as a matter of law, or insufficiently pled under *Twombly* and *Iqbal*.

---

[14]   DP Compl. ¶ 257 (a)-(h); *see also* Indir. Pur. Consol. Compl. at ¶¶ 5, 276-335.

### III.    LEGAL STANDARD

The standards applicable to this motion are familiar and well-established. Insofar as plaintiffs allege that the cooperatives' supply management program is not entitled to the protection of the Capper-Volstead Act, their claim presents a pure question of law that can be adjudicated under Rule 12(b)(6).  Indeed, the very purpose of the Rule 12 process is to allow courts to consider and adjudicate purely legal issues, dismissing those claims that are not premised upon a cognizable legal theory.  *See, e.g., Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  The same principle applies where the allegations of the complaint establish an affirmative defense.  *Jones v. Bock*, 549 U.S. 199, 215 (2007).  This principle applies to the argument addressed in Section IV, *infra.*

The same principle also applies to certain of plaintiffs' claims that Capper-Volstead protections do not apply because the defendants have entered into agreements with various third parties.  Those alleged agreements that are permissible as a matter of law can be conclusively resolved on this motion.  *See* Section V(A)–(C), and (D) (1) and (3).

The remaining alleged agreements are addressed in Section V(D)(2), (4), (5).  They are pled in a wholly conclusory and generalized fashion and fail to meet the requirements imposed by *Twombly* and *Iqbal.*  As stated by the Supreme Court, a plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(1)(2)).  *See also Kendall v. VISA U.S.A. Inc.,* 518 F.3d 1042, 1046-47 (9th Cir. 2008).

Rather, in considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, _ U.S. _ , 129 S. Ct. 1937, 1950 (2009).  However, it is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

As this Court has stated, "[t]o survive a motion to dismiss, a claim must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Mem. Dec. & Order, *Willnerd v. Sybase, Inc.*, Docket No. 1:09-cv-500-BLW, 2010 WL 4362855, at *1 (D. Idaho Oct. 26. 2010).

## IV.    SUPPLY MANAGEMENT AGREEMENTS ADOPTED AND IMPLEMENTED BY AGRICULTURAL COOPERATIVES AND THEIR MEMBERS ARE SHIELDED FROM ANTITRUST LIABILITY AS A MATTER OF LAW

In the early 1900's, the agricultural economy in the United States was depressed due to low prices and a huge surplus of agricultural products, with concomitant significant attrition among farmers.  Congress concluded that one of the principal causes of the depressed agricultural economy was the threat of antitrust prosecution and liability for collective action by farmers.  *See generally National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 824-27 (1978).  To address this concern, Congress passed Section 6 of the Clayton Act in 1914, and Section 1 of the Capper-Volstead Act in 1922.

An essential purpose of this legislation was to alleviate farmers' "particularly harsh economic position" by allowing them to organize into entities comparable to that of corporations in order to permit them to bargain effectively with large corporate buyers who, because of their buying power, could prevent farmers or producers from obtaining fair prices for their products. *Id.* at 825.  These statutes make clear that farmers could join together to act collectively when selling their products, in effect managing their businesses as if they were part of a single corporate entity.

Commenting on this overarching purpose, the Supreme Court observed:

> We believe it is reasonably clear from the very language of the Capper-Volstead Act, as it was in § 6 of the Clayton Act, that the general philosophy of both was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage — and responsibility — available to businessmen acting through corporations as entitie**s. . . .**  This indicates a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, ***and otherwise carry on like a business corporation*** without thereby violating the antitrust laws.

*Maryland and Virginia Milk Producers Assoc., Inc. v. United States*, 362 U.S. 458, 466 (1960) (emphasis added).

It is against that backdrop that the Court should evaluate the allegations made by plaintiffs in this litigation.  Confronted with the consequences of over-production, unstable prices and the inevitable unpredictability of growing conditions and crop yields, potato growers in Idaho and elsewhere followed the template established by the Capper-Volstead Act and subsequent cases.  They formed cooperatives and established a "supply management" program to

address over-production and fluctuating prices in the potato markets – all as permitted by the Clayton Act, the Capper-Volstead Act, and related statutes.

As a consequence, however enthusiastically and repeatedly plaintiffs may invoke the catch-phrases and labels of traditional antitrust litigation, the fact remains that neither the adoption of supply management programs by defendants, nor any of the activities allegedly taken to implement those wholly lawful agreements, states an actionable offense under federal or state antitrust law.

A.     The Statutory Bases of the Capper-Volstead Protections.

The principal bases of the cooperative antitrust protection are set forth in Section 6 of the Clayton Act (15 U.S.C. § 17), and Sections 1 and 2 of the Capper-Volstead Act (7 U.S.C. § 291-292), as clarified by the Cooperative Marketing Act of 1926 (7 U.S.C. § 455).  These statutes provide cooperatives and their members with protection from the antitrust laws, which was intended to allow them to **"carry on like a [unitary] business corporation without thereby violating the antitrust laws."**  *Maryland and Virginia Milk Producers,* 362 U.S. at 466 (emphasis added).

Section 6 of the Clayton Act, enacted in 1914, provides the original legislative foundation of the cooperative antitrust protection:

> Nothing contained in the antitrust laws shall be construed to forbid the existence and **operation of labor, agricultural or horticultural organizations** instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; **nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws**.

15 U.S.C. § 17 (1914) (emphasis added).  Section 1 of the Capper-Volstead Act clarified and

expanded the protection, and also specifically included cooperatives with capital stock:

> *Persons engaged in the production of agricultural products as farmers*, planters, ranchmen, dairymen, nut or fruit growers *may act together* in associations, corporate or otherwise, with or without capital stock*, in collectively processing, preparing for market, handling, and* **marketing** in interstate and foreign commerce*, such products of persons so engaged.*  Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to affect such purposes . . . .[15]

7 U.S.C. § 291 (1922) (emphasis added.)

In addition, the Cooperative Marketing Act of 1926 specifically permits the exchange of

information between producers, cooperatives or federations of cooperatives relating to the

dissemination of past, present, and prospective crop data, of market and statistical economic and

related information.  7 U.S.C. § 455 (1926).[16]  The 1926 Act and its legislative history made it

clear that cooperatives, their members, and other cooperatives and farmer groups could share

supply and demand information in order to avoid overproduction.  For example, Congressman

---

[15]   The only limiting provisions incorporated into Section 1 of the Capper-Volstead Act are: (1) no member is allowed more than one vote; or (2) the association or cooperative cannot pay dividends in excess of 8% per year; and (3) the association cannot deal in the products of nonmembers in an amount greater in value than that of the members.

[16]   The Agricultural Marketing Act of 1929 states that it is "the policy of Congress" to promote the economic efficiency of farmers in controlling and managing their production in order to avoid and prevent surpluses and overproduction,

> (4) by aiding in preventing and controlling *surpluses in any agricultural commodity*, through orderly production and distribution . . . and prevent *such surpluses* from causing undue and excessive fluctuations or depressions in prices for the commodity.

12 U.S.C. § 1141(a) (emphasis added).

Barbour said the legislation allows farmers to exchange and share supply and demand information "without being liable criminally" and will "tend to do away with this great problem of overproduction." 67 Cong. Rec. 2775 (1926).

     **B.**    **The Statutory Protections Allow Cooperatives and Their Members to Agree to Fix Prices and Limit Output.**

Plaintiffs allege throughout the amended complaints that defendants have conspired to fix prices by reducing the supply of potatoes. Yet, both price fixing and agreements to limit supply are protected by the Capper-Volstead Act.

     **1.**    **Collective Price-Setting Is Protected by the Capper-Volstead Act.**

The Capper-Volstead Act is founded on the principle that farmers should be able to join and function like a single business entity in marketing their products and responding to the forces of supply and demand. Consistent with this overriding legislative purpose, it is well-established that the laws shielding agricultural cooperatives from antitrust liability allow cooperatives and their members to agree upon the prices at which their agricultural products are sold. As stated by the Supreme Court, the Capper-Volstead Act permits "farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws." *Maryland & Virginia Milk Producers,* 362 U.S. at 466.

Subsequent cases overwhelmingly support the right of an agricultural cooperative to operate like a single corporation and fix the prices of its members' production as an integral function of marketing, irrespective of whether that is the sole marketing function that it performs, or whether it is part of other processing, handling, or marketing activities. *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1039 (2d Cir. 1980); *Northern Cal. Supermarkets, Inc. v.*

*Central Cal. Lettuce Producers Cooperative.*, 413 F. Supp. 984, 991 (N.D. Cal. 1976), *aff'd*, 580 F.2d 369 (9th Cir. 1978).  *Cf. Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 211, 214 (9th Cir. 1974) (citing *Maryland & Virginia Milk Producers,* 362 U.S. at 466).

### 2. Agreements Limiting Supply Are Protected by the Capper-Volstead Act.

The right of cooperatives and their members to "carry on as a business corporation" – to act as a single economic entity – confers not only the power to determine the prices of goods sold by its members, but also the right to determine other incidents of the production and marketing process, including the essential right to determine how much to produce.

#### a. *Price-fixing and output restrictions are two sides of the same coin.*

As basic economics teaches, there is an inextricable relationship between price and output. *See* XI HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1901d, at 187 (1998) ("price fixing has an inherent tendency to reduce the collective output of the participants in the price-fixing conspiracy").  The basic concept of a downward-sloping demand curve (consumers buy more as prices decline) embodies this fundamental relationship. For the same reason, basic economics also teaches that "an agreement to limit output is tantamount to an agreement to fix price." AMERICAN BAR ASSOCIATION, 1 ANTITRUST LAW DEVELOPMENTS 86 (6th ed. 2007).   To the same point, the leading industrial organization textbook notes that a "cartel can restrict output and let the demand curve determine price or raise price and let the demand curve determine output. *The two approaches are equivalent.*"  D. CARLTON AND J. PERLOFF,  MODERN INDUSTRIAL ORGANIZATION (4th ed.) 124 (emphasis added).  *See also id.* at 649-51 (discussing

legality of "price-fixing and output agreements" as interchangeable concepts under antitrust law).

As the Supreme Court has observed, "[s]upracompetitive pricing entails a restriction in output."

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 233 (1993).

As a result, antitrust cases routinely refer interchangeably to agreements to fix prices or restrict output.  *See, e.g., N.C.A.A. v. Board of Regents,* 468 U.S. 85, 110 (1984); *Federal Trade Commission v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 423 (1990); *General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,* 744 F.2d 588, 594 (7th Cir. 1984).  Similarly, courts have held that absent a statutory exemption, production or output agreements among competitors violate the antitrust laws because they result in price increases.  *See, e.g., Chicago Professional Sports, Ltd. v. NBA*, 95 F.3d 593, 598 (7th Cir. 1996) (limitations of NBA games team could televise was potential antitrust violation);  *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) ("conspiracy to limit output and thereby raise prices").

   **b.**      ***The legislative history recognizes supply restriction.***

Given the well-recognized equivalence between price and output agreements, it would be nothing short of extraordinary if the Capper-Volstead Act were interpreted to permit cooperatives to fix prices but not agree upon output.  While explicit price agreements may be more common forms of permitted conduct under Capper-Volstead, nothing in the statutory language or the legislative history of the statutes suggests that indirect price setting through an agreement limiting supply falls outside the Capper-Volstead protections.

As noted previously, one of the guiding principles underlying the protections afforded to agricultural co-ops is that it was important for farmers to have the ability to act collectively -- in a manner analogous to a single corporation -- in their dealings with powerful buyers.  To that

end, Congress plainly understood that the ability to make crucial marketing decisions such as

what to produce, how much to produce and what price to charge for the production, all are

critical to the success of a business enterprise.

As Senator Capper, explained:  "The bill is designed to give to the farmer the same right

to bargain collectively that is already enjoyed by corporations."  62 Cong. Rec. 2057 (1922).

Similarly, Representative Volstead, the co-sponsor of the legislation, observed:

> Businessmen can combine by putting their money into
> corporations, but it is impractical for farmers to combine their
> farms into similar corporate form.  The object of this bill is to
> modify the laws under which business organizations are now
> formed, so that farmers may take advantage of the form of
> organization that is used by business concerns.

61 Cong. Rec. 1033 (1921).

Consistent with this fundamental objective and principle, legislators repeatedly

recognized that an intended effect of the then-proposed legislation was to allow farmers to exert

collective control over production.  Thus, Senator Lenroot commented during the debates that

> If the farmers in the United States could, through cooperation,
> **have some control and agreement as to production** and as to
> prices, not for the purpose of making exorbitant profits, but so that
> they might at least secure back the cost of production, we would
> see in the United States immediately an upward turn toward
> prosperity.

62 Cong. Rec. 2225 (1922) (emphasis added).

Senator Hitchcock emphasized that farmers, deterred by the antitrust laws, could not

respond like corporate entities to decreases in demand unless there was clarification and

modification of the exemption:

> Not only that, but when there is a check in demand for the
> products which they are making the [manufacturers] **can reduce**

> ***the production***[,] . . . discharge their men, cut down their forces, and ***run their factories upon what is called 25 or 30 percent capacity, and merely feed out to the market what it will consume at their prices***.
>
> The farmer can not do that. . . .   He is not in a position to do as a manufacturer does.  He can not control his markets and he can not make his own prices, and he never ought to have been made subject to the provisions of the antitrust law.

62 Cong. Rec. 2262 (1922).  Senator Hitchcock confirmed that under the proposed modification of the exemption, a cooperative would be able to withhold and limit product from the market.  62 Cong. Rec. 2277 (1922).

It was not only proponents of the legislation who recognized its intended effect upon output.  Speaking against the Act, Senator King expressly recognized that Capper-Volstead would allow cooperatives to limit production, noting that,

> . . . it provides, as I interpret the measure, that [farmers] shall not only be permitted to combine for the purpose of marketing their products, but ***for the purpose of holding them for an indefinite period in order to secure higher prices***, even though such action might constitute a monopoly or restrain trade or be destructive of competition.

60 Cong. Rec. 312 (1920) (emphasis added).   Yet, that was precisely the point.  As Senator Capper noted, "no association can efficiently operate that does not control and handle a substantial part of a given commodity in the locality where it operates."  62 Cong. Rec. 2058 (1922).

Thus, there is no doubt that Congress contemplated and understood that the Capper-Volstead Act would authorize associations of farmers to affect prices by managing production and supply.  As discussed in the next section, this understanding has been confirmed

by cases recognizing that the exemption protects the efforts of grower cooperatives to limit supply.

> **c.**     ***Cases interpreting the Capper-Volstead Act have acknowledged that restrictions on supply are permissible***

In *Alexander v. National Farmers Organization*, 687 F.2d 1173 (8th Cir. 1982), the Eighth Circuit considered antitrust claims involving a cooperative's efforts to limit the supply of milk.  For a two-week period, the National Farmers Organization withheld milk deliveries in order to effect more favorable contract terms for NFO and its members.  The court approved the restriction on supply:

> NFO's sponsorship of a two-week milk withholding action was broad in scope and part of concerted demands for higher dairy prices.  The [trial] court found that no individual farmer's decision to withhold milk was coerced by NFO or otherwise.  When not directed at the elimination of competition, this type of activity, as a general matter, is within the scope of the Capper-Volstead exemption.

*Id*. at 1188.  In reaching its decision, the court observed that cooperatives cannot "conspire or combine with nonexempt entities to fix prices or ***control supply, even though such activities are lawful when engaged in by co-ops alone.***" *Id*. at 1182 (emphasis added).

In a litigated case entitled *In the Matter of Washington Crab Association, et al.*, 66 F.T.C. 45, 1964 WL 73029 (1964), the FTC asserted antitrust claims against the Washington Crab Association.  When processors refused to pay higher prices for crab as demanded by the association, the WCA members "sat on the beach" and refused to fish.  *Id.* at *10 (decision of the hearing examiner).  The initial hearing examiner's recommendation would have prohibited supply management, but the full Commission rejected that recommendation, holding, instead,

that the WCA's effort to control supply by refusing to fish was lawful under the Fisherman's

Collective Marketing Act, 15 U.S.C. § 521.

In reaching that conclusion, the Commission expressly relied upon the analogous

provisions of Capper-Volstead.  As the Commission declared:

> To be sure, this is a "limitation on production" and, except for the
> exemption afforded to these respondents by the Fisherman's
> Collective Marketing Act, 15 U.S.C. 521, would be a *per se*
> violation of the Sherman Act and the Federal Trade Commission
> Act.  But the Supreme Court has held, . . . that "the general
> philosophy of [Capper-Volstead] was simply that individual
> farmers should be given, through agricultural cooperatives acting
> as entities, the same unified competitive advantage – and
> responsibility – available to businessmen acting through
> corporations as entities."  *Maryland & Virginia Milk Producers
> Ass'n, supra,* 362 U.S. at 466.  Thus, so long as the members of a
> cooperative are acting pursuant to an agreement *voluntarily* entered
> into among themselves, they are to be considered as a single entity
> for antitrust purposes, the same as an ordinary business corporation
> with a number of "divisions."  ***There is no obligation on the single
> corporation to produce at capacity; it may produce in any volume
> that it likes, and allocate production among its several
> "divisions" in such proportions as it sees fit. . . .***  We see nothing
> unlawful in their limiting production by agreement among
> themselves, or in their "boat rotation."

*Id*. at *59 (bracketed material in original; bolded emphasis added).  Accordingly, although

decided under the Fisherman's Collective Marketing Act, the FTC expressly adopted the

reasoning used by courts under the Capper-Volstead Act in recognizing that the cooperative

could refuse to harvest or supply any product so long as its actions were not predatory. [17]

---

[17]   In a recent article, Christine A. Varney, the current head of the Department of Justice
Antitrust Division, points out that there is a slight difference in language between the FCMA
and Capper-Volstead.  *See* Varney, *The Capper-Volstead Act, Agricultural Cooperatives, and
Antitrust Immunity,* THE ANTITRUST SOURCE 5 (December, 2010), *at* http://www.antitrust
source.com. However, that observation overlooks the fact that – as quoted above – the
Commission expressly relied upon the ***Capper-Volstead Act*** and its stated purpose as

Other cases have held that the Capper-Volstead Act protects the actions of grower cooperatives that limit supply.  For example, in *Holly Sugar Corp. v. Goshen Cty. Cooperative Beet Growers Ass'n*, 725 F.2d 564, 569 (10th Cir. 1986), the Tenth Circuit recognized that the Capper-Volstead exemption protected the efforts of a sugar beet growers' association to prevent its members from contracting outside of the association.   In that case, the members of the association had signed a marketing agreement that prevented them from contracting individually with a buyer.  *Id*. at 566.  After the association failed to reach an agreement with the buyer, several growers sought to sell their sugar beets outside of the association.  *Id.*  The members then sued the association for relief from the marketing restriction, and the trial court granted the injunction.  *Id.* at 567.  The Tenth Circuit reversed and held that the marketing agreement did not violate antitrust laws and that the cooperative could prevent its members from negotiating independent sales contracts.  *Id.* at 569.  In other words, the cooperative could manage the supply of sugar beets by preventing its members from putting their crops on the market.

Similarly, in *Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Producers Cooperative*, 413 F. Supp. 984 (N.D. Cal 1976), *aff'd*, 580 F.2d 359 (9th Cir. 1978) (*per curiam*), the court upheld the lettuce cooperative's marketing agreement that required members to sell their lettuce within the limits of ceiling and floor prices, and that prevented the members from shipping lettuce that had not been sold.  *Id.* at 986.  Of course, the effect of the agreement was to limit the supply of lettuce in the market to that which could be sold within the agreed price range.  The court ruled that the activities of the co-op "are protected from antitrust attack by both

---

authority for allowing the fishermen to conduct themselves as a single entity and limit their production of crab.

Capper-Volstead and Section 6 [of the Clayton Act], since it is doing no more than carrying out the legitimate objects of an agricultural organization."  *Id.* at 994.

Finally, several federal and state cases have recognized that the Capper-Volstead Act protects the activities of dairy co-ops that limit production through the use of "standby pools" or other means.  *See, e.g., Ewald Bros., Inc. v. Mid-America Dairymen, Inc.*, 877 F.2d 1384, 1394 (8th Cir. 1989) (use of option agreement and standby pool were part of lawful effort to gain control of the supply of Grade A milk); *Fairdale Farms*, 715 F.2d at 32 (control over substantial portion of supply necessary for ability to increase prices); *Kinnett Dairies, Inv. v. Dairymen, Inc.*, 512 F. Supp. 608, 615-16, 633 (M.D. Ga. 1981) (the creation of a standby pool was a protected activity under the Capper-Volstead Act), *aff'd* 715 F.2d 520 (11th Cir. 1983); *United Dairymen of Arizona v. Schugg*, 128 P.3d 756, 764-65 (Ct. App. Ariz. 2006) (cooperative's dumping policy was not an illegal scheme to limit milk supply).

In sum, defendants respectfully submit that there can be no serious dispute that the supply management programs adopted and implemented by UPGA, UPGI, and their members fall comfortably within the terms of Capper-Volstead protection.  The unquestioned purpose of Capper-Volstead Act is to allow farmers to act as if they were part of a single entity; numerous cases hold that the statutory exemption for agricultural co-ops permits explicit price fixing agreements; it is a matter of basic economics – and recognized judicially – that price and output agreements are economically equivalent; and, many cases have approved a variety of practices of grower-cooperative that limit supply.[18]

---

[18]   In her article, Varney expressed the view that the status of supply limitations technically remains an open issue judicially under Capper-Volstead. *See* Varney, *supra* n.18, at 4-5. However, that statement fails to recognize the import of the cases cited above, and the

These issues can — and should — be determined with finality under Rule 12(b)(6) as they present a pure question of statutory interpretation. *Balistreri*, 901 F.2d at 699. No further proceedings are needed to resolve this legal issue, nor could any amendment possibly lead to a different conclusion. For that reason, unless plaintiffs have alleged facts which, if proven, could deprive defendants of their rights under the Capper-Volstead Act, both the direct and the indirect complaints must be dismissed.

## V.   PLAINTIFFS HAVE ALLEGED NO SET OF FACTS SUFFICIENT TO DEPRIVE DEFENDANTS OF THE PROTECTIONS OF THE CAPPER-VOLSTEAD ACT.

Plaintiffs acknowledge that there are statutory protections afforded to farmer cooperatives.[19] Nonetheless, plaintiffs contend that the defendant cooperatives are not "legitimate" and that they should not be entitled to the rights afforded by the Capper-Volstead Act and related statutes.[20] In particular, plaintiffs advance a series of reasons why they claim defendants are not entitled to the protection of Capper-Volstead.

- Plaintiffs contend that UPGA and its members are not legitimate cooperatives and they do not wash, grade, package, store, transport, or distribute [their] members' potatoes.[21]

- The amended complaints allege that because some of the members of the cooperatives are vertically integrated producers who also pack and

---

necessary implications of her own recognition that the basic idea behind the Capper-Volstead immunity was to allow farmers to "take advantage" of the "law applicable to the ordinary business corporations." *Id.* at 3. Surely no one would seriously argue that a corporation lacks the right to determine how much it chooses to produce or offer for sale.

[19]   DP Compl. ¶ 249; IP Compl. ¶ 271.

[20]   DP Compl. ¶ 256; IP Compl. ¶¶ 275.

[21]   DP Compl. ¶¶ 257(a); IP Compl. ¶¶ 278.

distribute potatoes, the cooperatives and its farmer-members forfeit their rights under Capper-Volstead.[22]

- Plaintiffs assert that the cooperatives and their member-farmers have engaged in predatory and coercive conduct, which destroys the privilege.[23]

- The complaints allege that defendants have advanced their supply management program by conspiring with (a) third parties, (b) nonmember potato farmers, (c) foreign entities, (d) nonmember partners, and (e) United II, which is described as a "non-grower, vertically integrated potato purchaser."[24]

Each of these claims suffers from one of two fatal defects.  First, a number of the asserted grounds for denying the defendant these protections are simply insufficient as a matter of law. Accordingly, just as with the argument regarding the scope of Capper-Volstead discussed in the preceding section, these allegations present pure questions of law that can be resolved with finality on this motion.

Second, in the remaining instance, the amended complaints must be dismissed for failure to plead facts that are remotely sufficient to establish the potential "plausibility" of their contentions. That failure cannot be remedied and also requires dismissal.

A.    **The Defendant Cooperatives Are Legitimate Co-Ops under the Capper-Volstead Act**

Plaintiffs allege that UPGA and its members are not legitimate cooperatives, apparently (at least in part) because they do not wash, grade, package, store, transport, or distribute members' potatoes, and do not "market" or negotiate contracts for the sale of those potatoes."[25]

---

[22]  DP Compl. ¶ 257(b); IP Compl. ¶¶ 5(ii).

[23]  DP Compl. ¶¶ 257(c); IP Compl. ¶¶ 5(iii).

[24]  DP Compl. ¶ 257(d)-(h); IP Compl. ¶¶ 5(iv)-(viii).

[25]  DP Compl. ¶ 260; IP Compl. ¶ 278.  Plaintiffs also claim that a cooperative composed of co-op members is not legitimate.  This claim is addressed *infra* at D.1.

Taken as true, these allegations do not support the conclusion that the exemption is inapplicable in this case.

In *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc*., 497 F.2d 203 (9th Cir. 1974), two cooperatives of potato growers sought protection from liability under the Capper-Volstead Act.  The principal function of each co-op was to bargain collectively for their members for pre-season potato contracts.  *Id.* at 206.  The plaintiff potato processors claimed that the cooperatives were not entitled to immunity from antitrust liability because they did not engage in any of the functions enumerated in the Capper-Volstead Act and relied upon by plaintiffs in this case.  *Id.* at 214-15.  The Ninth Circuit rejected this argument, holding that the bargaining activities of the cooperatives were protected:

> True, the associations did not collectively process, prepare for market, handle or actually sell potatoes.  But Section 1 of the Capper-Volstead Act further authorizes "Persons engaged in the production of agricultural products as farmers ... (to) act together in associations ... in collectively ... marketing in interstate and foreign commerce, such products of persons so engaged . . . may have marketing agencies in common."

*Id.* at 215.  The single function of these potato cooperatives as bargaining agents was a protected marketing activity even though the cooperatives did not wash, grade, package, store, transport, or distribute any potatoes.

*Treasure Valley* was followed by the court in *Northern Cal. Supermarkets v. Central Cal. Lettuce Producers Cooperative,* 413 F. Supp. 984 (N.D. Cal 1976), *aff'd,* 580 F.2d 369 (9th Cir. 1978) (*per curiam*).   That case involved an association of farmers organized for the sole purpose of setting prices or price ranges for the sale of its members' lettuce.  *Id.* at 986.  The plaintiff argued that the cooperative was not entitled to Capper-Volstead protection because the Act only

"permit[s] price-fixing by an agricultural cooperative where the price-fixing is ancillary to and a necessary incident of an otherwise legitimate collective activity."  *Id.* at 987-88.  As stated by the court: "Essentially, [plaintiff] argues that an agricultural cooperative must engage in bargaining, selling, processing or handling before it can also fix prices."  *Id.* at 991.  Finding *Treasure Valley* controlling, the court rejected plaintiff's argument and held that "even if [the cooperative] engaged in no other collective marketing activity, mere price-fixing is clearly within the ambit of statutory protection."  *Id.* at 992.  *See also Fairdale Farms*, 635 F.2d at 1040 (citing *Central California Lettuce* in rejecting the contention that a cooperative "must do more than just fix prices in order to get the benefit of" Capper-Volstead).

Therefore, plaintiffs' legal allegation that the protections of Capper-Volstead do not apply in this case because the cooperatives do not "wash, grade, package, store, transport, or distribute" their members' potatoes fails as a matter of law.

### B.   The Capper-Volstead Act Protects Cooperatives That Include as Members Vertically Integrated Producers

The complaints next assert that the membership of vertically integrated potato growers/packagers/shippers in the defendant cooperatives automatically invalidates the protection of the Capper-Volstead Act.[26]  Plaintiffs' assertion is wrong as a matter of law and reflects a misconception of the statutory scheme.  While Capper-Volstead immunity may be lost where cooperatives include members who do not fit within any of the categories of agricultural producers identified in the statute, the fact that a member who is engaged in agricultural activities within the scope of Capper-Volstead ***additionally*** undertakes other activities on a

---

[26]   DP Compl. ¶¶ 264-69; IP Compl. ¶¶ 281-86.

vertically integrated basis does not destroy the co-op's status as a legitimate Capper-Volstead association.

As indicated above, the basic purpose of the Capper-Volstead Act was to offset the power of the large middlemen-buyers of farm products in the distribution chain and allow farmers to obtain higher prices for their products.  One goal of the legislation was to bring the growers closer to consumers through vertical integration of the distribution functions. 7 U.S.C. § 291; 59 Cong. Rec. 7852 (1920).  With that goal in mind, the legislation was specifically designed to allow and encourage farmers to eliminate the powerful middlemen by vertically integrating to convert their agricultural production into finished consumer products.  And, it was well recognized that the vertical integration could be accomplished either by individual members, or through the collective efforts of the members of their cooperative.  62 Cong. Rec. 2163 (1922).

In the debate over the then-proposed legislation, both Senator Walsh and Senator Pomerene observed that the proposed legislation would allow integrated farmer/processor membership.  *Id.*   In fact, Senator Walsh explained that such integration was an essential purpose of the Act:

> That is just exactly what we want to do by this.  **We want to allow a lot of farmers**, instead of bringing their milk into a cheese factory run by private capital, selling their milk to the corporation which runs that cheese factory, to be permitted **to associate themselves together** — which of course, would eliminate competition between themselves — **build their own cheese factory, bring their milk to that cheese factory, sell the cheese, and divide the profits.  This is what this bill is for**.

62 Cong. Rec. 2163 (1922) (emphasis added).

Supreme Court precedent confirms that integrated grower/processors can be members of cooperatives without losing Capper-Volstead status.  In *Case-Swayne Co. v. Sunkist Growers,*

*Inc.*, 389 U.S. 384 (1967), the Court held that the presence of non-farmer middlemen as members could eliminate the protection of the Capper-Volstead.  However, that protection was lost not because of the presence of growers who performed ***additional*** functions, but only because of the presence of packers who were not also growers.  *Id.* at 386, 393, 395-96.

Indeed, on remand, the district court specifically ruled that after the membership of Sunkist was reorganized to include only integrated grower/processors, the Capper-Volstead Act protection applied.  *Case-Swayne Co. v. Sunkist Growers, Inc.*, 355 F. Supp. 408, 414-15 (C.D. Cal. 1971).  In other words, under the Sunkist reorganization, as approved by the court, Sunkist continued to include individual growers who employed their own individual packing facilities or who could select facilities owned by the cooperative.  *Id.* at 415.

It follows that simply because a member of a cooperative is vertically integrated does not mean the exemption is destroyed.  Here, the complaints expressly allege that the vertically integratesd producers named as defendants are ***potato growers***.[27]  Thus plaintiffs have failed to allege any facts, which taken as true, would support the conclusion that the members of any of the defendant cooperatives were vertically integrated in a manner that is not consistent with the application of the Capper-Volstead Act.

C.     **The Amended Complaints Do Not Allege That the Cooperatives Have Engaged in a Form of Predatory Conduct That Would Eliminate the Protection of the Capper-Volstead Act**

Plaintiffs next assert that the protections of the Capper-Volstead Act do not apply because the cooperatives and their members allegedly have engaged in "predatory" conduct,[28]

---

[27]   DP Compl. ¶¶ 34-35, 267-69; IP Compl. ¶¶ 68-69, 284-86.
[28]   DP Compl. ¶¶ 270-75; IP Compl. ¶¶ 287-91.

seeking to take advantage of cases holding that "predatory" activity is not exempted by Capper-Volstead.  *See, e.g., Maryland and Virginia Milk Producers*, 362 U.S. at 472 (cooperative's acquisition of a dairy processor in order to deprive independent dairy farmers of a market constituted an unlawful predatory act); *Bergjans Farm Dairy v. Sanitary Milk Producers*, 241 F. Supp. 476 (E.D. Mo. 1965), *aff'd*, 368 F.2d 679 (8th Cir. 1966) (cooperative's acquisition of a fluid milk plant and related conduct to cut off independent producers' access to processing facilities held to constitute predatory conduct); *GVF Cannery v. Cal. Tomato Growers Ass'n,* 571 F. Supp. at 711, 715 (N.D. Cal. 1981) ("The only limitation upon attempts, conspiracies, or combinations to monopolize undertaken by Capper-Volstead organizations is that such groups may 'neither acquire nor exercise monopoly power in predatory fashion'").

Specifically, the amended complaints allege that defendants used "satellite imagery, fly-overs, GPS systems," to observe crop production; that the co-ops conducted "audits and inspections of members' farms;" and that they reviewed members' "confidential farm subsidy forms."[29]  Plaintiffs also state that members could opt out of the acreage reduction agreement at a cost of $100 per acre.

To appreciate the flaws in plaintiffs' analysis, it is critical to understand how the term "predatory" is used in antitrust generally, as well as in the context of the activities of agricultural cooperatives.  "Predatory" conduct refers to actions taken for the purpose of harming competitors or to coerce businesses to engage in conduct against their will. The term is used most commonly in the context of monopolization cases under Section 2 of the Sherman Act.  Its closest synonym in antitrust vocabulary would be "exclusionary." *See, e.g., Aspen Skiing Co. v. Aspen Highlands*

---

[29]   DP Compl. ¶¶ 271-73; IP Compl. ¶¶ 288-90.

*Skiing Corp.,* 472 U.S. 585, 602 (1985) (referring interchangeably to the standards for proving

whether conduct is "fairly characterized as 'exclusionary'. . . or 'predatory'").

It follows that predatory conduct within the meaning of Capper-Volstead is conduct that

is aimed at eliminating competition from current or potential rivals or groups of rivals.  *Fairdale*

*Farms Inc. v. Yankee Milk, Inc.*, 715 F.2d 30, 31-32 (2d Cir. 1983); *Farmland Dairies, Inc. v.*

*New York Farm Bureau, Inc.*, Nos. 87-CV-1622 (FJS), 89-CV-567 (FJS) 1996 WL 191971 at *6

(N.D.N.Y. Apr. 15, 1996); *Washington Crab Association, et al.*, 66 F.T.C. 45, ("predatory

conduct" found where members of a crab fishing cooperative threatened to physically injure or

sink the boats of fishermen those who would not cooperate with co-op).

In *Treasure Valley,* the Ninth Circuit listed conduct that had been held to be "predatory"

in prior Capper-Volstead cases, including picketing, boycotts, coerced membership, price

discrimination, and secret rebates — all activities that fit within the categories or actions designed

to harm or coerce competitors or third parties. 497 F.2d at 216 n.11.  Notably absent from the

Ninth Circuit's list, or from any case in that predatory conduct has been found in the Capper-

Volstead context, are consensual agreements of the type that frequently are at issue in

agricultural co-op cases, and that are at issue here.

Not only is plaintiffs' invocation of the term "predatory" misplaced analytically, but their

predation argument is fundamentally at war with the basic thesis of their complaints. Far from

contending that cooperative members or third parties were "coerced" into supporting the supply

management program, plaintiffs complaints are premised upon the proposition that these

programs resulted from an ***agreement*** among growers that was ***beneficial*** to them.  There is,

understandably, no allegation that particular members or nonmembers were threatened or forced

into joining the management supply program.  *See, e.g. Bybee Farms, LLC v. Snake River Sugar Co.*, 563 F. Supp. 2d 1184, 1196 (E.D. Wash. 2008) (persuasion is not coercion within the context of the Agricultural Fair Practices Act); *Luft Farms, LLC v. Western Sugar Cooperative*, 2009 WL 426240 at *8-10 (D. Col. Feb. 20, 2009) (same).

Moreover, if an agreement limiting competition (whether over price, output or other materials terms of production or sale) is lawful, the fact that the cooperative may engage in conduct designed to ensure that members are adhering to their agreements does not change the analysis or the result.  Or where, as here, the co-op's supply management program is not unlawful under Capper-Volstead, then the alleged use of satellite imagery, fly-overs, GPS systems, audits, or other techniques to implement the program cannot possibly be deemed predatory.  The alleged conduct is protected, not proscribed, by federal law.[30]

### D.   Plaintiffs' Allegations That Defendants Conspired with Various Third Parties Are Insufficient as a Matter of Law or Are Implausible

The remaining reasons plaintiffs assert to avoid the protections of the Capper-Volstead Act all involve the claim that defendants conspired with a variety of third parties, nonmember growers, foreign entities, nonmember "partners," and United II.[31]  Once again, these arguments are unavailing.

### 1.   Agreements Among Cooperatives Are Protected

Plaintiffs argue that cooperation among different organizations of growers somehow prevents UPGA, UPGI and their members from asserting the protections provided by Capper-

---

[30]   In addition, under the Cooperative Marketing Act, co-ops may "acquire, exchange, interpret, and disseminate past, present, and prospective crop, market, statistical, economic, and other similar information."  7 U.S.C. § 455.

[31]   DP Compl. ¶ 257(d)-(h); IP Compl. ¶ 5(iv)-(viii); 293-335.

Volstead.[32]   However, this is mistaken as a matter of law since agreements among grower

cooperatives have long been held to be protected under the Act.

For example, UPGA is organized as a federation of cooperatives, with ten cooperative

members.[33]  It is, in that sense, directly analogous to the situation presented in *Sunkist Growers,*

*Inc. v. Winkler & Smith Citrus Products Co*., 370 U.S. 19 (1962), in which the Supreme Court

held that three citrus cooperatives could act in concert under the protection of the Capper-

Volstead Act.  The Court stated:

> We are squarely presented, then, with the question whether
> Sunkist, Exchange Orange, and Exchange Lemon ─ the three legal
> entities formed by these 12,000 growers ─ can be considered
> independent parties for the purposes of the conspiracy provisions
> of §§ 1 and 2 of the Sherman Act. . . .
>
> There can be no doubt that under [the Capper-Volstead Act] the
> 12,000 California-Arizona citrus growers ultimately involved
> could join together into one organization for the collective
> processing and marketing of their fruit and fruit products without
> the business decisions of their officers being held to be
> combinations or conspiracies. . . .
>
> With due respect to the contrary opinions of the Court of Appeals
> and District Court, *we feel that the 12,000 growers here involved*
> *are in practical effect and in the contemplation of the statutes*
> *one 'organization' or 'association' even though they have*
> *formally organized themselves into three separate legal entities.*

*Id*. at 27-29 (emphasis added).  *See also Treasure Valley*, 497 F.2d at 212-13, 217 (holding that

an agreement between two potato bargaining associations was protected by the Capper-Volstead

---

32   DP Compl. ¶¶ 258-59, 277; IP Compl. ¶¶ 276-77, 294.

33   The ten members of UPGA are United At-Large Co-op; United Fresh Growers of Colorado,
United Potato Growers of Idaho, Kern Produce Shippers, United Fresh Potato Growers of the
Klamath Basin, United Potato Growers of Montana, Red River Valley Fresh Potato Growers
Cooperative, United Southwest Potato Growers, United Fresh Potato Growers of
Washington/Oregon, and United Potato Growers of Wisconsin.  DP Compl. ¶ 14; IP Compl.
¶ 33.

exemption);  *GVF Cannery v. California Tomato Growers Ass'n,* 511 F. Supp. at 714 (three tomato cooperatives were entitled to agree among themselves to fix prices; "[t]hat which agricultural producers may combine to accomplish within a single association, they may lawfully combine to achieve by way of multiple organizations").  Because separate legal entities may work cooperatively and still retain Capper-Volstead protection, as a matter of law, the allegation that UPGA is composed of cooperatives not growers, does not destroy the protection.

The same principle disposes of the argument that defendants have forfeited their Capper-Volstead protection because UPGI colluded with non-defendant grower entities.[34]  Specifically, plaintiffs name three, alleging that UGPI entered in memorandums of understanding with the Potato Growers of Idaho ("PGI"), the Southern Idaho Potato Cooperative ("SIPCO"), and the Seed Potato Growers of Idaho ("SPGI")[35]  Each of these third party organizations is alleged in the complaints to be an association of ***potato growers***:  PGI and SIPCO are alleged to be "bargaining units" for potato growers,[36] and SPGI is an association for seed potato growers.[37] These allegations, taken as true, do not destroy the Capper-Volstead protection because, a noted above, collaboration between grower organizations is protected by the Capper-Volstead Act. *Sunkist Growers,* 370 U.S. 27-29; *Treasure Valley,* 497 F.2d at 217 (recognizing collaboration between bargaining associations did not destroy the exemption).[38]

---

[34]  DP Compl. ¶ 276; IP Compl. ¶ 293.

[35]  DP Compl. ¶¶ 176, 277; IP Compl. ¶¶ 214, 294.

[36]  DP Compl. ¶¶ 177, 179; IP Compl. ¶¶ 215, 218.

[37]  DP Compl. ¶ 180; IP Compl. ¶ 217.

[38]  Moreover, even if plaintiffs' allegations were not insufficient as a matter of law, they still would not be legally sufficient under *Twombly/Iqbal.  See* DP Compl. ¶¶ 176, 277; Consol. IP Compl. ¶¶ 214, 294. Plaintiffs' complaints do not provide any information as to the subject matter of the alleged agreements, the parties, when the agreements allegedly were

### 2. Plaintiffs Have Not Sufficiently Alleged That UPGA and Its Members Unlawfully Colluded with Nonmember Growers

Plaintiffs next allege that UPGA and its members "conspired with nonmembers in seeking to reduce potato supply."[39]  Specifically, the complaints allege that UPGA and UPGI "sought out and allowed non-members to participate in their acreage reduction programs" and other efforts to manage supply.[40]

Unlike the allegations considered thus far which fail as a matter of law because they do not state a legally cognizable legal theory, there may be circumstances in which the involvement of nonmember growers in non-exempt conduct could affect the application of Capper-Volstead protection. Whatever the theoretical sufficiency of such claims, plaintiffs have failed to provide the Court with any plausible factual basis for inferring that defendants have done anything that would deprive the cooperatives, or their members, of immunity.

Plaintiffs allege that UPGA and its members "conspired with non-members in seeking to reduce potato supply."[41]  Specifically, the complaints allege that UPGA and UPGI "sought out and allowed nonmembers to participate in their acreage reduction programs" and other efforts to manage supply.[42]

These barebones allegations do not remotely meet plaintiffs' burden under *Twombly*. While the complaints allege generally that UPGA and its members conspired with

---

formed, or anything about their content, let alone how these supposed agreements purportedly harmed competition.

[39]  DP Compl. ¶ 282; IP Compl. ¶ 299.

[40]  DP Compl. ¶¶ 284, 285-94; IP Compl. ¶¶ 300, 301-08.

[41]  DP Compl. ¶ 282; IP Compl. ¶ 299.

[42]  DP Compl. ¶¶ 284, 285-94; IP Compl. ¶¶ 300, 301-08.

nonmembers,[43] one searches in vain for the identity of even a single non-member grower who assertedly so agreed, let alone any allegations regarding the timing, circumstances, or terms of such an agreement.  In short, there is nothing even remotely setting forth the "who, what, where, when and how" that are now the touchstones of legal sufficiency.  *See, e,g., Kendall v. Visa U.S.A., Inc.* 518 F.3d 1042, 1047 (9th Cir. 2008); *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50-51 (2d Cir. 2007); *In re Hawaiian & Guamanian Cabotage Antitrust Lit.,* 647 F. Supp. 2d 1250, 1256-57 (W.D. Wa. 2009).

This is a critical and fatal failing. The very point of *Twombly* is that it is not inherently unlawful for firms to communicate about matters relating to their respective businesses, including such things as price or output, or for firms to behave in a parallel fashion based upon their own independent business decisions. 550 U.S. at 553-54.  For that reason, the Supreme Court held that allegations which offer no more than a recitation of matters that are consistent with independent as well as collusive conduct are not sufficient to permit massive antitrust litigation to proceed. *Id.*; *Hawaiian & Guamanian,* 647 F. Supp 2d at 1256-57.

The lessons of *Twombly* and *Iqbal* are particularly relevant in the present case, because there may be perfectly appropriate reasons for potato growers to communicate about prices and supply.  For example, dealings with nonmembers are permitted by the Capper-Volstead Act, which specifically and clearly provides that an association may deal in the products of non-members so long as such dealings do not exceed "an amount greater in value than such as are handled by it for members." 7 U.S.C. § 291.  In this context, communications between the coop and non-members are both inevitable and anticipated by the Act.

---

[43]   DP Compl. ¶¶ 282, 284; IP Compl. ¶¶ 299, 300.

Here, the most that plaintiffs are able to offer is references to communications in which representatives of UPGA extol the benefits of having nonmembers join in the supply management program.[44]  That is not remotely enough.  *See, e.g., In re Southeastern Milk Antitrust Litig.,* 555 F. Supp. 2d 934, 942 (E.D. Tenn. 2008); *In re Graphics Processing Units Antitrust* Litig.*,* 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (case dismissed where complaint lacked "any specific allegation that defendants' representatives actually met to fix prices").  Not only do plaintiffs fail to provide necessary details such as time, place and participants, but also they fail to allege that there actually was an agreement -- as opposed to the mere opportunity to make one. That is a decisive failure since it is only an actual "agreement" that suffices. *Twombly,* 550 U.S. at 556-57; *Southeastern Milk,* 555 F. Supp. 2d at 942; *Graphics Processing,* 527 F. Supp. 2d at 1023.  As the district court noted in one case, "[a] distinguishing factor between …cases [granting and denying motions to dismiss under *Twombly*] has been the inclusion of specific allegations concerning time, place and person . . . ." *Hawaiian & Guamanian,* 647 F. Supp. 2d at 1256-57.

### 3.   The Alleged Agreements Between UPGA and Foreign Growers Do Not Destroy the Capper-Volstead Protections

Next, plaintiffs assert that Capper-Volstead protection is lost because of alleged cooperation with a group of Canadian potato growers in an organization known as the United Potato Growers of Canada ("UPGC").[45]   Even if true, however, as a matter of law, domestic cooperatives do not forfeit their protected status simply by admitting foreign growers as members or by collaborating with foreign agricultural cooperatives.

---

44   DP Compl. ¶¶ 285-94; IP Compl. ¶¶ 301-08.
45   DP Compl. ¶¶ 295-309; IP Compl. ¶¶ 309-23.

In *Northland Cranberries, Inc. v. Ocean Spray Cranberries, Inc.,* 382 F. Supp. 2d 221 (D. Mass. 2004), the court rejected the argument that a United States cranberry grower cooperative forfeited its Capper-Volstead rights because the cooperative had Canadian members. The court reasoned that "the Capper-Volstead Act is plain and unambiguous in its reference to 'persons,'" and that "[t]he term 'persons' refers to foreign farmers as well as American farmers." *Id*. at 225.  The court rejected the argument that the presumption against extraterritorial application of United States law mandated that "persons" as used in the Capper-Volstead Act did not include foreign agricultural producers.  *Id*. at 227-28.  Accordingly, the alleged collaboration between UGPA and the Canadian potato growers does not eliminate the protections of the Capper-Volstead Act.

### 4.     Plaintiffs Have Not Sufficiently Alleged That UPGA and Its Members Unlawfully Colluded with Non-Exempt "Partners."

Plaintiffs also cite to the UPGA "partnership" program as one that destroys Capper-Volstead protection.[46]  However, the claims related to this innocuous sponsorship program do not include any particular allegation of an anticompetitive agreement between the cooperatives and any "partner."  Rather, it is evident from the complaints that the "United Potato Partners Program" was an advertising opportunity whereby manufacturers of potato production products could have access to cooperative members for advertising purposes in exchange for funding cooperative activities.[47]  How that amounts to a "plausible" antitrust offense, or suggests a "plausible" reason for depriving defendants of Capper-Volstead immunity is nowhere suggested.

---

[46]   DP Compl. ¶¶ 310-14; IP Compl. ¶¶ 324-27.

[47]   *See* DP Compl. ¶ 311; IP Compl. ¶ 325.

**5.    Plaintiffs Have Not Sufficiently Alleged That UPGA and Its Members Unlawfully Colluded with Non-Exempt Third Parties**.

Finally, the complaints allege that United II Potato Growers of Idaho, Inc. and RD Offutt Co. formed a joint venture – North American Food LLC – for the purpose of assuring that the potato grower members of United II would have an assured or guaranteed market for potatoes grown by United II member growers. [48]  The joint venture acquired dehydration  facilities and a brand name (Idahoan Foods), from Idaho Fresh-Pak, Inc., and R.D. Offutt contributed three dehydration plants. [49]

As an initial matter, the formation of the joint venture was not anticompetitive and does not compromise Capper-Volstead  protection.  Whether or not Capper-Volstead protects supply management programs (as discussed in Section IV of this memorandum), at most plaintiffs' allegations show an integrated joint venture engaged in potato purchasing and processing.[50] Vertical integration is presumptively procompetitive and protected by Capper-Volstead.  *See supra* at Section V(B).

The complaints highlight that the sale of potatoes to Idahoan Foods has competitive benefits: the creation of a more efficient broader processing network that gives more convenient access to markets, allowing better vertical integration of production (*e.g.,* more efficient use of surplus potatoes); and more efficient production operations.[51]   Furthermore, there are no factual allegations that the joint venture caused any reduction in the supply of potatoes.  There is no

---

[48]   DP Compl. ¶ 316-17; IP Compl. ¶ 329-30.

[49]   DP Compl. ¶ 316; IP Compl. ¶ 329.

[50]   This point is discussed more fully in the memoranda submitted separately by defendants Idahoan Foods, LLC and R.D. Offutt Co.

[51]   DP Compl. ¶¶ 122-23, 126-27; IP Compl. ¶¶ 156-57.

allegation, for example, that Idahoan destroys potatoes.  Because the formation of the joint

venture was not anticompetitive, plaintiffs' allegations, even if taken as true, do not state a

"plausible" antitrust claim.  At most, the allegations relating to the formation of the joint venture

describe nothing more than the existence of a separate and lawful, business venture, which is

entirely irrelevant to the issues in this case.

Moreover, United II is a potato cooperative made up of UPGI members.[52]  The

complaints allege nothing more than vertical integration by a cooperative to acquire an interest in

a processing facility.  The clear language of Capper-Volstead encourages farmers to do exactly

what United II accomplished by the formation of the joint venture and its acquisition of the

dehydration facilities and trade name — to process, prepare for market, handle and market their

products.  7 U.S.C. § 291.  Nothing in the joint venture compromises the protection provided by

the Capper-Volstead Act.

## VI.    CONCLUSION

Plaintiffs have not pled a case sufficient to proceed.  As a matter of law, the Court should

conclude at this stage of the proceeding that the Capper-Volstead Act and related statutes allow

the defendant cooperatives and growers to engage in supply management.  Moreover, the Court

also should conclude that plaintiffs' allegations that defendants have conspired with a variety of

nonmembers and third parties are insufficient to remove the protections provided by the Capper-

Volstead Act in this case.  For these reasons, the complaints should be dismissed.

---

[52]   DP Compl. ¶¶ 27-29, IP Compl. ¶¶ 44, 46-47.

Respectfully submitted on March 18, 2011.


By: /s/ James S. Lowrie
    JONES WALDO HOLBROOK & MCDONOUGH PC
    James S. Lowrie
    Andrew G. Deiss
    Billie J. Siddoway

    HOLLAND & HART LLP
    James E. Hartley
    Steven B. Andersen

    PORTER WRIGHT
    Donald M. Barnes
    Salvatore A. Romano

    *Counsel for United Potato Growers of Idaho, Inc.;*
    *United Potato Growers of America, Inc.; United II*
    *Potato Growers of Idaho, Inc.; Albert Wada; Wada*
    *Farms, Inc.; Wada Farms Potatoes, Inc.; Wada-Van*
    *Orden Potatoes, Inc.; Wada Farms Marketing Group,*
    *LLC; Michael Cranney; Keith Cornelison;*
    *Cornelison Farms, Inc.; Snake River Plains Potatoes,*
    *Inc.; and Raybould Brothers Farms LLC*

    ORRICK, HERRINGTON & STUCLIFFE, LLP
    Stephen V. Bomse
    Robert A. Rosenfeld

    BELNAP, STEWART, TAYLOR & MORRIS
    Monte N. Stewart
    Daniel W. Bower

    *Counsel for Blaine Larsen; Blaine Larsen Farms, Inc.;*
    *Driscoll Potatoes, Inc.; and Rigby Produce, Inc.*