UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: FRESH AND PROCESS POTATOES ANTITRUST LITIGATION | Case No. 4:10-MD-2186-BLW **MEMORANDUM DECISION AND ORDER** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## INTRODUCTION

In December 2011, this Court granted certain defendants' motions to dismiss, though it allowed plaintiffs to amend as to four defendants: (1) Potandon Produce LLC, (2) United II Potato Growers of Idaho, Inc. (United II), (3) Idahoan Foods, LLC, and (4) R.D. Offutt Co.  Plaintiffs filed amended complaints against these defendants and also named a new individual defendant – Ronald D. Offutt, Jr.  All these defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See* Dkts. 180, 182, 183, 194.  The Offutt defendants also moved for summary judgment on two discrete factual issues.  *See* Dkt. 180.  For the reasons explained below, the Court will deny all pending motions to dismiss and will deem the motion for summary judgment moot.

## ALLEGED FACTS[1]

Plaintiffs, who are both direct and indirect potato purchasers, contend that defendants illegally agreed to reduce the supply of potatoes in order to raise prices. Plaintiffs assert that the alleged scheme started when potato growers in Idaho formed a cooperative called United Potato Growers of Idaho (UPGI).  The Idaho potato growers, along with potato farmers in several other states, then established United Potato Growers of America (UPGA) as an umbrella cooperative.

Plaintiffs assert that the cooperatives were created for the purpose of increasing the price of potatoes through supply management.  Plaintiffs allege that defendants implemented their plan by, among other things, agreeing to limit potato acreage, and by paying farmers to either destroy existing potatoes or refrain from growing additional potatoes in order to reduce the overall number of potatoes available for sale to direct purchasers.  Plaintiffs contend that defendants' supply reduction program caused potato prices to be fixed, raised, maintained, and/or stabilized.  Accordingly, plaintiffs contend that defendants' actions violate established antitrust laws.

## LEGAL STANDARD

The standards governing Rule 12(b)(6) motions are familiar.  These motions test the legal sufficiency of a complaint.  *Conley v. Gibson*, 355 U.S. 41, 46 (1957).  Federal

---

[1] More detailed facts specific to each moving defendant are set forth below.  Additionally, a fuller statement of facts relating to non-moving defendants is contained in the Court's December 2, 2011 Order.  *See* Dkt. 159, at 21-23.

Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555.  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id*. at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Id*.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id*. at 557.

In a more recent case, the Supreme Court identified two "working principles" that underlie *Twombly*.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  *Id*.  "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions." *Id.* Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Providing too much in the complaint may also be fatal to a plaintiff. Dismissal may be appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n. 1 (9th Cir. 1997) (stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other . . . evidence on summary judgment establishes the identical facts").

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) (issued two months after *Iqbal*).[2] The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N.*

---

[2] The Court has some concern about the continued vitality of the liberal amendment policy adopted in *Harris v. Amgen*, based as it is on language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), suggesting that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim. . .." Given *Twombly* and *Iqbal*'s rejection of the liberal pleading standards adopted by *Conley,* it is uncertain whether the language in *Harris v. Amgen* has much of a life expectancy.

*Cal. Collection Serv., Inc.,* 911 F.2d 242, 247 (9th Cir. 1990).  The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore & Warehouse Union*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citations omitted).

**ANALYSIS**

Plaintiffs allege that defendants violated § 1 of the Sherman Act, which prohibits "any contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  To state a claim under § 1, plaintiffs must plead facts that plausibly suggest "(1) an agreement or conspiracy among two or more persons or distinct business entities, (2) by which the persons or entities intend to harm or restrain competition, and (3) which actually injures competition."  *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989).  Additionally, for each individual defendant, plaintiff must allege that *that* defendant had "'a conscious commitment to a common scheme designed to achieve an unlawful object.'"  *Monsanto Co. v. Spray-Rite Corp.*, 465 U.S. 752, 764 (1984) (citation omitted).

In this round of Rule 12(b)(6) motions, the moving defendants fall into two categories:  Potandon is a marketer defendant and the others are "dehydrator defendants." The Court will first address Potandon's motion, and then turn to the dehydrator defendants' motions.

1.      **The Marketer Defendant – Potandon**

Unlike many of the defendants in this action, Potandon does not grow potatoes.  It sells potatoes and onions to major retailers, club stores, wholesalers, produce distributors and restaurant chains.  It is also the marketing agent for several grower defendants.

Plaintiffs' theory is that Potandon joined and participated in the supply-reduction/price-fixing conspiracy by assisting growers in "flow-control" efforts.  As plaintiffs explain it, flow control is exactly what it sounds like – controlling the number of potatoes that flow into the marketplace.  The underlying economics are simple – keep supply levels such that they do not exceed demand, which will, in turn, ensure that prices do not drop.  *See IPC*[3] ¶¶ 224-25 (quoting a March 2007 UPGI newsletter, which explains: "'Flow controls are based upon sound economic princip[le]s . . . if daily offerings (supplies) DO NOT exceed buyers' needs (demand), buyers begin calling salesman searching for product.  When salespeople DO NOT have the product available, they raise the price.'").

The Court dismissed plaintiff's original complaints against Potandon primarily because plaintiffs had not alleged Potandon was directly involved in flow-control efforts.  Both amended complaints cure this deficiency.  The indirect purchasers now allege that Potandon directly participated in flow-control efforts by changing the grade assigned to

---

[3] Throughout this decision, IPC refers to the indirect purchasers' Second Consolidated Amended Class Action Complaint (Dkt. 164).  DPC refers to the direct purchasers' Second Amended Class Action Complaint (Dkt. 163).

potatoes based on supply levels, rather than the actual quality of the potatoes.  More

specifically, the indirect purchasers allege:

> Potandon knowingly participated in the flow control and output restriction
> scheme through intentionally imposing pretextual and inconsistent grading
> controls on the fresh potatoes it sold. Throughout the Class Period,
> Potandon's principals met on a weekly basis in Snake River Valley, Idaho,
> to discuss flow control issues, including the amount of potatoes to be sold
> on the fresh potato market.
>
> As a result of these weekly meetings, and in order to reduce the number of
> potatoes sold on the fresh potato market when fresh potatoes supplies were
> high, Potandon management instructed the Potandon operations team to
> grade potatoes more rigorously. Potandon's employee oversaw the more
> rigorous grading of the potatoes in Potandon's own packing sheds,[4] as
> well as the packing sheds of other growers, including Larsen Farms and
> Driscoll Potatoes.  Potandon's application of the more rigorous grading
> standards while supplies were high facilitated the conspirators' objective of
> reducing the supply of potatoes to the fresh potato market.  Potandon
> thereby reduced the supply of fresh potatoes to the market by intentionally
> participating in the flow control and output restrictions.

*IPC* ¶¶ 226-27.  The direct purchaser plaintiffs allege similar facts regarding pretextual

grading:

> One of the methods used by Potandon to control the flow of potatoes to the
> market in concert with its growers was "grading" – the process of
> modifying quality criteria in order to increase or reduce the flow of potatoes
> into the market. Following their meeting with Potandon's constituent
> growers, Potandon executives would direct Potandon's Director of Idaho
> Operations with regard to the appropriate grading standard. Potandon would
> gather its Quality Assurance (QA) personnel and the Director of Operations

---

[4]The parties dispute whether Potandon owns packing sheds.  *See, e.g., Potandon Reply*,
Dkt. 214, at 6-7; *Indirect Purchaser Opp.*, Dkt. 206, at 13-14.  For purposes of resolving this
motion, the Court will accept as true the allegation that Potandon has its "own packing sheds."
*See IPC* ¶ 226 (quoted above); *DPC* ¶ 99 (alleging Potandon supracompetitively raised prices
"both *in its own sheds* and through its growers' sheds.") (emphasis added).

would instruct the QA personnel regarding the grading standard to be employed and whether to adjust the flow of potatoes on to the market, based on the information acquired during the weekly growers meeting.

If there were excessive quantities of potatoes in the growers' sheds, Potandon would direct its QA personnel to use stricter quality guidelines in order to reduce the volume of potatoes available for sale. Conversely, if the quantities of stored potatoes were comparatively low, Potandon would instruct its QA personnel to use less rigid quality guidelines and thus permit larger numbers of potatoes to enter the market. By judicious use of this "grading" strategy, Potandon and its constituent growers were able to ensure that the price of potatoes was maintained at supracompetitive levels.

*DPC* ¶¶ 101-02*; see also id.* ¶¶ 95-103.

With these allegations, the Court can reasonably infer that Potandon joined and participated in the conspiracy.

Potandon complains that there is no allegation directly showing that it agreed to join the conspiracy. As Potandon puts it, "there is no allegation that Potandon signed a United membership agreement or contract, or was an incorporator founder, or member of United . . . ." *Reply*, Dkt. 214, at 3. But plaintiffs may rely on circumstantial evidence of an agreement – so long as these evidentiary allegations allow the Court to reasonably infer that Potandon joined the conspiracy. *See generally Twombly,* 550 U.S. at 556 ("a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made"); *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) ("To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement or circumstantial evidence. The question then becomes whether these alleged facts make it plausible that Appellees had an agreement . . . .") (internal citation omitted).

Here, viewing the allegations regarding pretextual grading in the light most favorable to plaintiffs, it is reasonable to infer that Potandon joined and participated in the conspiracy.

Potandon next argues that it did not pretextually grade potatoes and contends that plaintiffs' allegations to the contrary are absurd.  At this stage, the Court will accept as true plaintiffs' allegation that Potandon arbitrarily graded potatoes based on supply levels rather than the actual quality of the potatoes.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  The Court does not find the pretextual grading allegations, or plaintiffs' theory regarding Potandon, to be patently illogical or absurd, as Potandon argues.

The Court is also unpersuaded by Potandon's argument that the complaint fails because there is an obvious, alternative explanation for Potandon's otherwise lawful conduct.  True, Potandon grades potatoes according to their quality, and there is no dispute that this is a lawful activity.  But plaintiffs do not simply allege that Potandon graded potatoes and then ask the Court to infer some nefarious purpose for lawful grading.  Rather, plaintiffs directly allege that Potandon adjusted its grading standards based on supply levels, rather than quality.  Potandon does not offer any independent lawful reason for pretextually grading potatoes.

Because plaintiffs have successfully alleged Potandon directly participated in the conspiracy, the Court need not address the agency theories of liability in detail.[5]  Briefly, however, the Court finds plaintiffs' factual allegations sufficient under a "marketing agent" theory.  Under this theory, Potandon argues that plaintiffs failed to allege that Potandon intended to restrain trade itself, as opposed to simply earning its usual and customary commission.  *See generally* 7 Herbert Hovenkamp & Philip E. Areeda, *Fundamentals of Antitrust Law* ¶ 1474c (3d ed. 2010) (marketing agent not liable for the acts of its alleged principal in a § 1 conspiracy unless the agent (1) had "knowledge of its supplier's purpose to restrain trade," (2) "intended to restrain trade itself rather than simply earn its usual and customary commission,"and (3) contribute[d] materially to the restraint.").  The complaint does not say this in so many words.  But it is reasonable to infer such intent based on the pretextual grading allegations.

**2.      The Dehydrator Defendants**

The dehydrator defendants include United II, R.D. Offutt, Ronald D. Offutt, Jr., and Idahoan Foods, LLC.  Plaintiffs allege that in March 2007, R.D. Offutt Co. partnered with United II to create the Idahoan Foods joint venture.  The deal allegedly included the following components:  (1) UPGI formed United II, which is a second cooperative made up of some UPGI members; (2) R.D. Offutt contributed potato processing plants to the venture; (3) United II and R.D. Offutt own Idahoan Foods, which is a limited liability

---

[5]Additionally, in responding to this round of motions, plaintiffs do not appear to rely on a single-entity theory of liability. The Court will therefore not address that issue.

company; (4) Idahoan Foods acquired a company (Idaho Fresh-Pak) that had four dehydration plants; and (5) United II's grower-owners supply all the potatoes for Idahoan Foods' Idaho and Nevada plants.  *DPC* ¶¶ 146-48, 369-70; *see also IPC* ¶¶ 131, 137, 147-48.

Plaintiffs allege that Idahoan Foods was created as part of the overall scheme to reduce supplies and elevate prices.  As plaintiffs put it, the "joint venture enabled potato growers to offload surplus potatoes into the dehydration market and further reduce supplies, thus facilitating and contributing to the price-fixing scheme . . . ."  *DPC* ¶ 146; *see also IPC* ¶132.  The plaintiffs also allege that UPGI explicitly and publicly stated the joint venture's purpose.  *See, e.g., DPC* ¶ 379; *IPC* ¶¶ 132-33.  For example, the complaints allege that "UPGI discussed the joint venture in its March 2007 newsletter and stated, 'United of Idaho [UPGI] feels that the current dehy strategy being implemented is critical to United's overall mission of supply management."  *IPC* ¶ 133; *DPC* ¶ 379.

What the earlier complaints did not do was plausibly allege that R.D. Offutt and United II viewed the transaction similarly, or entered into it for the same reasons.  Thus, the Court dismissed the complaints.  As explained below, the amended complaints cure this deficiency.

### A.     United II

Turning first to United II, plaintiffs now plausibly allege that United II made a conscious commitment to join the conspiracy.  The most significant new allegation is that

United II's stated corporate purpose, as articulated in its articles of incorporation, is "'to stabilize potato prices and supplies in the State of Idaho . . . ." *DPC* ¶ 30; *IPC* ¶ 138. This statement undercuts United II's insistence that it did nothing more than form a joint venture to participate in the dehydration market.  If that were the case, one might expect the statement of corporate purpose to say something like, "United II's purpose is to compete in the dehydration market."  It is also noteworthy that UPGI – an alleged conspirator – has the same statement of corporate purpose as does United II.  *See DPC* ¶ 217; *IPC* ¶ 203.

And while United II's statement of corporate purpose, standing alone, is not necessarily sufficient to support an inference that it joined the underlying conspiracy, it puts plaintiffs' other allegations on a new footing.  Specifically, earlier complaints contained fairly extensive allegations regarding *UPGI's* (not United II's) view of the joint venture.  As the Court explained in its earlier order, just because UPGI viewed the transaction one way did not mean that United II shared that view.  But now we have two companies with virtually identical statements of corporate purpose, and one company was created right at the time UPGI announced the use of a dehydration venture as part of its supply-management plan.  So it becomes far more reasonable to infer that these two companies had a shared vision for the joint venture.

Moreover, the direct purchaser plaintiffs have fleshed out their complaints with

new allegations regarding United II.[6]  Among other things, these plaintiffs now allege

that:

- United II requires its members to abide by UPGI's supply management policies, including acreage restrictions. *DPC* ¶ 372.

- United II board members had discretion to "siphon off" up to three percent of United II members' top quality fresh potatoes to processors in order to "balance the fresh pipeline" by taking fresh potatoes off the market. *Id.* ¶¶ 373-74.

- United II also encouraged its members to commit an additional five to 10 percent of fresh potatoes for dehydration. *Id.* ¶ 376.

- Thus, according plaintiffs, United II board members sought to divert as much as 13% of its members' fresh potatoes into the less profitable processed potato market in order to protect returns in the fresh potato market.

Under these alleged facts, the Court may reasonably infer that United II joined and

participated in the conspiracy.

Finally, the Court is not persuaded by United II's argument that plaintiffs have

done nothing more than allege that United II participated in a pro-competitive joint

venture.  To be sure, the mere formation of a joint venture – standing alone – would not

_____

[6]The direct purchasers' new allegations regarding United II are more extensive than the indirect purchasers'.  The indirect purchasers basically just add United II's statement of corporate purpose, along with an allegation showing that United II's board is populated with numerous UPGI members.  United II argues that both new complaints are deficient, but does not directly argue that if the direct purchasers' complaint survives, the indirect purchasers' complaint should not.  *See, e.g., United II Reply*, at 3 n.5 (noting that the direct purchaser complaint is more extensive than the "minimal allegations made by the indirect purchaser plaintiffs").  Regardless, however, even the indirect purchasers' minimal new allegations are just enough to nudge their claim against United II across the line from "possible" to "plausible."

support a conclusion that the venturers consciously committed to a common scheme designed to achieve an unlawful objective.  Additionally, an ordinary purchase contract is not sufficient to bind a party to a conspiracy.  *See, e.g., Rick-Mik Enters, Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976 (9th Cir. 2008).  But as discussed, plaintiffs have successfully alleged that United II did more than form a joint venture or enter into an ordinary purchase contract.  They have plausibly alleged that United II joined the conspiracy alleged in the complaint.

### B.  The Offutt Defendants' Motion to Dismiss

Plaintiffs have also plausibly alleged that the Offutt defendants joined the supply-management conspiracy.

The Court dismissed the earlier complaints against corporate defendant R.D. Offutt because it was unclear if R.D. Offutt had committed itself to the supply management conspiracy, as opposed to simply entering into the dehydration venture for its own lawful, independent reasons – namely, to acquire potatoes for dehydrators.  In their amended complaints, however, the direct purchasers allege that in March 2007 – precisely at the time when the dehydration venture was being formed – "R.D. Offutt explicitly agreed to join UPGI . . . thereby affirming his commitment to UPGI's potato supply manipulation agenda – and agreed to reduce supply as a result."  *DPC* ¶ 144.  The direct purchasers base this allegation on a March 2007 UPGI newsletter, which included the following report about the dehydration venture:

> United of Idaho (United I) is also forming a separate cooperative
> called United II which will offer to potato growers (who are
> currently members or decide to become members of United I)
> preferred stock in United II. . . .  This new United II cooperative
> will partner with Ron D. Offutt Company (RDO) to form a newly
> combined company, which is yet to be officially named, but is
> currently known as "NewCo."  Once the combined deal is
> accomplished, . . . NewCo will be a consolidated dehydration
> company with United II owning and contributing the Idahoan
> plants and RDO owning and contributing its plants in North
> Dakota, Nevada, and Idaho.  *Ron Offutt has also agreed to join
> United.*

*Mar. 2007 UPGI Bulletin,* Dkt. 208-3, at 2 (internal paragraph divisions omitted;

emphasis added); *see generally Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)

(court may examine documents referred to in the complaint without transforming the

motion to dismiss into a motion for summary judgment).

The indirect purchasers take a somewhat different tack with regard to Offutt

defendants.  They allege that the Offutt defendants *actually* joined – not just agreed to

join – UPGI and, moreover, that Ron Offutt was a "founding member."  *See IPC* ¶¶ 143,

145.  These allegations prompted the Offutt defendants' motion for summary judgment

and that motion, in turn, prompted the indirect purchasers to disavow their allegations that

the Offutt defendants had *in fact* joined UPGI, or that Ron Offutt was as founding

member of the cooperative.  The direct purchasers also cross-moved for relief under Rule

56(d), asking for additional time to conduct discovery on the membership question.

The upshot of all these motions is that for 12(b)(6) purposes, plaintiffs are left with

an allegation that Ron Offutt *agreed* to join UPGI.  (The direct purchasers used the

"agreed to join" language in their complaint, while the indirect purchasers refer to the March 2007 newsletter quoted above, which uses the "agreed to join" language.)  The Offutt defendants did not move for summary judgment on that factual allegation.

The Court finds even this lesser allegation significant.  The fact that UPGI announced Mr. Offutt's agreement to join UPGI right at the time the joint venture was being formed makes it reasonable for the Court to infer that the Offutt defendants entered the underlying conspiracy (even in the absence of actually joining UPGI) – particularly when this new allegation is viewed alongside plaintiffs' other factual allegations.

Specifically, plaintiffs also allege that R.D. Offutt is a large, North Dakota-based grower, with 60,000 acres devoted to potatoes.  *See IPC* ¶ 144; *DPC* ¶ 140.  As plaintiffs point out, R.D. Offutt thus has at least a theoretical motive to join a conspiracy aimed at stabilizing potato prices in the fresh-potato market.  *See generally Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) (recognizing that in complex antitrust litigations, "motive and intent play leading roles").

Further, R.D. Offutt sent representatives to a November 2004 meeting regarding the formation of regional and national cooperatives.  Thus, R.D. Offutt presumably had knowledge of UPGI's key purpose – to reduce potato supply so as to maintain and increase potato prices.

Before the amendment, these allegations did little more than suggest that R.D. Offutt had the opportunity to join the conspiracy.  But when these allegations are

considered in context with the new allegation – that Ron Offutt agreed to join UPGI – the Court finds it reasonable to infer that the Offutt defendants joined the underlying supply-management conspiracy – even if their names did not appear on UPGI's membership records.

The Offutt defendants argue that the allegation about "agreeing to join" UPGI is insufficient because plaintiffs fail to allege what Mr. Offutt *did* or *said* to indicate such an agreement.  The Court is not persuaded.  This argument would be persuasive if plaintiffs did nothing more than allege that Mr. Offutt agreed to join UPGI in March 2007.  But these allegations are not made in a factual vacuum.  Rather, plaintiffs supplied detailed facts about the March 2007 dehydration venture, R.D. Offutt's role in it, prior knowledge of UPGI's goals, and the like.  Given this factual context, the allegation that the Offutt defendants agreed to join the conspiracy (and, more specifically, viewed the dehydration venture as a tool of the conspiracy) is plausible.  No additional factual detail is necessary at this stage.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Twombly*, at 565 n.10); *see also In re TFT-LCD (Flat Planel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (granting plaintiffs leave to amend complaint, indicating that "plaintiffs need not plead each defendant's involvement in the alleged conspiracy in elaborate detail, but must simply include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy").

### C.  The Offutt Defendants' Motion for Summary Judgment

As noted above, the Offutt defendants asked the Court to grant partial summary judgment on two discrete allegations:  (1) that Ron Offutt never joined UPGI; and (2) the R.D. Offutt Company never joined UPGI.  On reply, however, the Offutt defendants suggest that the Court need not rule on its motion for summary because plaintiffs "disavowed allegations that R.D. Offutt Company joined UPGI – the allegations that gave rise to the motion for summary judgment."  *Reply*, Dkt. 215, at 4.  The Court concurs with this assessment because, as discussed, plaintiffs have plausibly stated a claim against the Offutt defendants by alleging that "Ron Offutt *agreed to join* United."  The Offutt defendants did not move for summary judgment on that issue. The Court therefore deems the motion for summary judgment – along with defendants' cross-motion for relief under Rule 56(d) – moot.

### D.  Idahoan Foods

The Court will deny Idahoan Foods' motion to dismiss because plaintiffs have now plausibly alleged that Idahoan is an "instrumentality" of its owners (R.D. Offutt and United II) in the supply-reduction conspiracy.  *See DPC* ¶ 162[7]; *see generally Am. Needle, Inc. v. NFL,* — U.S. —, 130 S. Ct. 2201 (2010).

---

[7]The indirect purchasers do not use the term "instrumentality" in describing Idahoan (and this term comes from the Supreme Court's decision in *American Needle*, which will be discussed). But, like the direct purchasers, they allege evidentiary facts supporting a conclusion that Idahoan was an instrumentality of its owners.  *See, e.g., IPC* ¶¶ 130-49, 299, 329-36.

This Court dismissed earlier complaints against Idahoan primarily because plaintiffs had not pled "evidentiary factual allegations tying Idahoan to the scheme alleged in the complaint other than the fact of the dehydration joint venture agreement." *See Dec. 2, 2011 Order,* Dkt. 159, at 55.  The amended complaints cure this deficiency by fleshing out allegations regarding the dehydration venture, as well as the joint venture partners – R.D. Offutt and United II.  Specifically, as the Court explained above, in earlier complaints, plaintiffs had plausibly alleged that UPGI (but not United II or R.D. Offutt) viewed the dehydration venture as a critical component of the supply-reduction plan.  But the amended complaints plausibly allege that R.D. Offutt and United II viewed the dehydration venture the same way, entered the horizontal supply-reduction conspiracy, and used the Idahoan venture to further that conspiracy.

Idahoan argues that it cannot be liable for the actions of its owners – R.D. Offutt and United II – because it is a separately incorporated legal entity.  *See Idahoan Reply*, Dkt. 217, at 3.  Two Supreme Court cases – *Copperweld* and *American Needle* – guide the Court's analysis of this argument.  *See Am. Needle, Inc. v. NFL,* — U.S. ——, 130 S. Ct. 2201 (2010); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984).

The central teaching of both cases is that "concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities."  *Am. Needle*, 130 S. Ct. at 2209.  Rather, "'substance, not form, should determine whether a[n] ... entity is

capable of conspiring under § 1.'" *Id*. at 2211 (quoting *Copperweld*, 467 U.S. at 773 n. 21). So the fact that two companies may have organized themselves "under a single umbrella or into a structured joint venture" is not dispositive. 130 S. Ct. at 2212. Instead, the "relevant functional inquiry is whether there is a conspiracy between 'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking.'" *Robertson v. Sea Pines Real Estate Cos*., 679 F.3d 278 (4th Cir. 2012) (citing *Am. Needle*, 130 S. Ct. at 2212 and *Copperweld*, 467 U.S. at 769)).

The Supreme Court recently applied these concepts in *American Needle*. There, the National Football League formed a corporate joint venture – National Football League Properties (NFLP) – to manage the NFL's intellectual property. The NFLP initially granted nonexclusive licenses to several vendors to sell apparel with team insignias. Later, it granted an exclusive license to Reebok – thus excluding the plaintiff, who sued for antitrust violations. *Am. Needle*, 130 S. Ct. at 2211. The Court held that the licensing activities of the NFLP constituted concerted action within the meaning of § 1 of the Sherman Act. The Court concluded that "[a]lthough NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned." *Id*. at 2213. Therefore, "[t]hirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm's profits. The

teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's financial well-being." *Id*. at 2215.  As a result, the Court held that the NFL teams and the NFLP were appropriately subject to suit under § 1 for NFLP's licensing activities.  *See also United States v. Sealy*, 388 U.S. 550 (1967).

Here, plaintiffs allege a similar scenario.  Viewing the complaints as a whole, both plaintiffs allege that R.D. Offutt and United II are separately controlled, potential competitors with economic interests distinct from Idahoan's financial well-being.  *See Am. Needle*, 130 S. Ct. at 2215.  They have also plausibly alleged that when R.D. Offutt and United II make decisions for Idahoan, they allegedly "capture individual economic benefits separate and apart from" Idahoan's profits.  *See id.*  That is, according to plaintiffs, when Idahoan accepts potatoes that could have gone into the fresh-potato marketplace, it furthers the supply-reduction scheme.  Thus, plaintiffs have plausibly alleged that the "members of a legally single entity violated § 1 [because] . . . the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity." *Am. Needle*, 130 S. Ct. 2209 (citing, among other cases, *Sealy*, 388 U.S. 350).  Under these allegations, Idahoan is subject to suit under § 1 of the Sherman Act.

Idahoan argues that *Copperweld* compels a different result.  *Copperweld* held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." 467 U.S. at 771.  In

other words, in that case, the parent and subsidiary could not conspire because they acted

as a single entity and it takes two to conspire.  *See id.* (the parent and subsidiary "have a

complete unity of interest . . . their general corporate actions are guided or determined not

by two separate consciousnesses, but one").

Courts interpreting *Copperweld* have held that "it does not follow from

*Copperweld* that subsidiary entities are *automatically* liable under § 1 for any agreements

to which the parent is a party.  As a matter of well-settled common law, a subsidiary is a

distinct legal entity and is not liable for the actions of its parent or sister corporations

simply by dint of the corporate relationship."  *In re Ins. Brokerage Antitrust Litig.*, 618

F.3d 300, 341 n.44 (3d Cir. 2010) (emphasis added); *see also Mitchael v. Intracorp, Inc.*,

179 F.3d 847, 857 (10th Cir. 1999).

Idahoan points to these decisions to support its argument that because it is a

separately incorporated LLC, it cannot be held liable as a conspirator based on the actions

of its owners.[8]  This argument is not persuasive, however, because, the Court has not

concluded that Idahoan is potentially liable in this case based *solely* on the fact that its

owners are alleged conspirators.  Rather, as instructed by both *Copperweld* and *American

Needle*, the Court has looked beyond this corporate relationship "in favor of a functional

---

[8] Idahoan points out that in its earlier order, the Court stated that it would not disregard
the separate corporate form of another defendant – Potandon.  *See Dec. 2, 2011 Order*, Dkt. 159,
at 45 ("Potandon – a separate corporate entity – cannot be implicated in the conspiracy based
solely on the fact that one of its owners was an alleged conspirator.") (citing *In re Ins. Brokerage
Antitrust Litig.*, 618 F.3d at 341 n.44).  But the defendants are distinguishable because plaintiffs
did not plausibly allege that Potandon was created and operated as an instrumentality of the
conspiracy.

consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle*, 130 S. Ct. at 2209.  And, as already discussed, the plaintiffs have plausibly alleged that Idahoan was, in reality, "a formalistic shell for ongoing concerted action." *Id.* at 2215.

Idahoan's remaining arguments in favor of dismissal are also unavailing.

First, the Court is not persuaded that plaintiffs must do still more to plausibly allege a § 1 claim against Idahoan.  For example, Idahoan notes that plaintiffs do not allege that Idahoan disposed of surplus potatoes or paid a premium for fresh potatoes when it really only needed dehydrated-grade potatoes.  *See Idahoan Mem.*, Dkt. 183-1, at 10.  But under *American Needle,* they key is that Idahoan's decisions "reflect not only an interest" in its "profits but also an interest in" the venturers' individual profits.  130 S. Ct. at 2215.  In other words, Idahoan does not necessarily have to act *against* its own interests to be an instrumentality of the conspiracy, and plaintiffs have now plausibly alleged that the entire point of the dehydration venture was to further the supply-management conspiracy.

Second, the Court is not persuaded by Idahoan's argument that it did not join the conspiracy because it was not involved in 2004, when the cooperative first formed.  A conspirator can theoretically join an ongoing conspiracy at any time and plaintiffs have plausibly alleged that Idahoan joined the conspiracy in 2007, despite not being involved in the early stages. *Cf. United States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975) ("The

fact that new members joined the conspiracy as time went on and old members may have dropped out does not preclude a finding that a single, ongoing conspiracy existed.").

Third, the Court is not convinced that plaintiffs' amended complaints contradict earlier ones. *See Idahoan Mem.*, Dkt. 183-1, at 7-9. Here, Idahoan focuses mainly on plaintiffs' earlier allegation that Idahoan "was formed 'to create a broad network of potato processing plants with convenient access to markets and to customers.'" *Original DPC,* Dkt. 39, ¶ 122; *Original IPC*, Dkt. 63, ¶ 156. This allegation does not appear in the amended complaints.

Idahoan seems to be arguing that plaintiffs are locked into alleging that Idahoan is pro-competitive because of this allegation. *See Idahoan Mem.*, Dkt. 183-1, at 8. But all along, plaintiffs have alleged that the dehydration venture was a component of the overall conspiracy. *See, e.g., Original DPC Comp.* ¶ 124 ("Through its United II/North American Foods joint venture, UPGI has devised an admitted means of furthering its supply-reduction and price-fixing efforts."). Thus, the Court cannot conclude that plaintiffs' amended complaints contradict its earlier ones.

In sum, plaintiffs have plausibly alleged that Idahoan is subject to suit under *American Needle.* The Court will therefore deny Idahoan's motion to dismiss.

## ORDER

**IT IS ORDERED THAT**:

1. All pending motions to dismiss (Dkts. 180, 182, 183, 194) are **DENIED.**

2.    Defendant R.D. Offutt Co. and Ronald Offutt's Motion for Partial Summary

Judgment (Dkt 180) is **MOOT.**



DATED:  **July 27, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge