UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **IN RE: FRESH AND PROCESS POTATOES ANTITRUST LITIGATION** | Case No. 4:10-md-02186-BLW-CWD |
| THIS MATTER PERTAINS TO: | **MEMORANDUM DECISION AND ORDER RE MDL DKT. 539, DIRECT PURCHASER PLAINTIFFS' MOTION TO COMPEL** |
| *Direct Purchaser Plaintiffs Action.* | |

   This memorandum decision and order completes the Court's review and analysis

of Direct Purchaser Plaintiffs' Motion to Compel (MDL Dkt. 539). The Court

incorporates by reference the introduction, background, and discussion of the standards to

be applied from its prior memorandum decision and order, (MDL Dkt. 625), and will

address the remaining privilege issues below.[1]

---

[1] Appendix A identifying the documents on the various privilege logs that Plaintiffs contend are subject to their motion to compel can be found at MDL Docket No. 540-1.

**DISCUSSION**

**3.** **Waiver of the Privilege by Voluntary Disclosure of Privileged Communications to Third Parties— Potandon, Orrick Defendant Driscoll, Andersen Defendant UPGA, and Offutt**

    **A.** *Potandon*

Potandon contends that the common interest doctrine applies to protect the documents identified on Appendix A, category 3. It argues that the communications at issue, although not made in anticipation of litigation, fall within the common interest doctrine because the parties to the communications shared a common legal interest to meet requirements of the Capper-Volstead Act and plan their conduct accordingly. The Court will address this category of documents in its discussion about the common interest doctrine in Section 7, below.

    **B.** *Orrick*

Plaintiffs identify seven documents on Appendix A, category 3, that they claim are not privileged because the documents appear to have been disclosed to third parties. Plaintiffs identified documents attached to the Pouya Declaration, Ex. A, as follows: Priv. 548, 549, 880, 881, 882, 883, and 961. Document number 549 was identified also in Appendix A, category 1, and the Court previously ordered it produced. It appears to be an attachment to document number 548, an email from Rdale Price forwarded to several individuals, and it contains an email chain from attorney Randon Wilson providing legal advice regarding the Farmer Cooperatives. The attachment ordered produced per the Court's prior order was a legal research document. Here, the Court orders Priv. 548 to be

produced, as it should fall within the scope of the privilege waiver and Plaintiffs are entitled to the context within which the legal advice was given.

Documents 880-883 appear to be an email chain between counsel which had, as an attachment, a draft marketing agreement between Potandon and Agricultural Cooperative. The email was shared among Jeremy Ladle, attorney Dave Gallafent and Winston Beard, and copied to others, including Loraine Driscoll. Dave Gallafent has been the attorney for the Driscoll family and the Sterling cooperative. Document 961 is another email chain from Jeremy Ladle sent to attorney Dave Gallafent and copied to others, including Loraine Driscoll, discussing the draft marketing agreement. Orrick contends that the email chain was between counsel, and provided information necessary for providing legal advice regarding the draft marketing agreement. Orrick Defendants explain that Driscoll was involved with cooperatives NFC, Premier, and Sterling, as well as a stockholder of Potandon, and that these seven documents reflect communications between an attorney for the organization and constituents in their organizational capacity that the individuals expected to remain confidential.

Orrick cites Rule 1.13 of the Idaho Rules of Professional Conduct as grounds for maintaining the privilege. Comment 2 to the rule states that, "[w]hen one of the constituents of an organizational client communicates with the organization's lawyer in that person's organizational capacity, the communication is protected" even if the constituent is not a client of the organization's attorney. But the rule is meant to protect communications by constituents or members of the same organization, such as when Member A of Organization B consults with the organization's attorney.

Here, however, the communications appear to have been shared between and among Driscoll, NFC, Premier, and Sterling. Orrick claims that Driscoll, in its capacity as a member of NFC, Premier, and Sterling, and because of its stakeholder interest in Potandon, sought the advice of the organization's attorney. However, the description on the privilege log indicates the draft marketing agreement was related to Driscoll's business interests in the cooperatives. In other words, from the description, Driscoll was seeking business advice concerning its marketing arrangements with the cooperatives. It does not appear that Driscoll was acting solely in its capacity as a constituent of the cooperatives. The advice then was shared with several individuals Orrick failed to identify in its privilege log or brief. Other than Loraine Driscoll and Dave Gallafent, the Court has no idea who Jeremey Ladle, Winston Beard, Steve Ottum, Mel Davenport, and Gabriel Boldt are, or what their relationship is to Driscoll. All of these individuals are recipients of the email.

Based upon the description in the privilege log, it does not appear the privilege applies to the remaining five documents. The privilege does not extend to communications about a joint business strategy between or among different entities even if the communication happens to include a concern about litigation. *FSP Stallion 1, LLC v. Luce*, 201 WL 3895914 *18 (D. Nev. Sept. 30, 2010). Further, it was Orrick's burden to explain why the privilege applies, and Orrick did not adequately identify all the individuals who received the communication. These remaining five documents should be produced.

## C.    *Andersen*

Plaintiffs identify six documents on Appendix A, category 4, for which they claim Andersen Defendant UPGA waived the privilege by voluntarily disclosing the communications to third parties. The Court has reviewed the privilege log entries for these eight documents. All eight entries reflect that the documents are board meeting minutes containing the legal advice of attorney Randon Wilson to UPGA, Mr. Wilson's client, which were disseminated to the UPGA Board and documented in the Board's meeting minutes. The legal advice is described as advice concerning meeting protocols, corporate documents, tax issues, and cooperative documents.

In the context of Andersen Defendant UPGA's privilege log, the Court finds the communications directed to UPGA, or authored by UPGA in the form of meeting minutes, and shared with the UPGA board, are protected from disclosure. The communications reflect confidential attorney-client communications from UPGA's attorney Rand Wilson given to UPGA, which may only act through its board members.[2] *See Upjohn v. United States*, 449 U.S. 383 (1981) (discussing the scope of the privilege when the client is a corporation). The motion to compel is denied as to these six documents.

## D.    *Offutt*

Plaintiffs identify eight documents on Offutt's privilege log on Appendix A, category 3, for which they claim Offutt Defendants waived the privilege. The documents

---

[2] However, if these same board meeting minutes containing legal advice directed to UPGA were then disseminated elsewhere, and appear on other privilege logs as email attachments, the privilege may have been waived by others.

appear on R.D. Offutt Company's privilege log. In reviewing the log entries, the Court observes the email communications were all to or from Mr. Paul Noah, General Counsel for R.D. Offutt Company. Others were copied on the emails. The individuals copied on the emails have email addresses from wholly owned subsidiaries of R.D. Offutt Company, such as RDO Equipment Company. *See* Aff. of Noah (Dkt. 567-2.) Several of the communications involve attorney legal advice regarding an investigation by the Department of Justice.

The Court finds the eight documents on the privilege log are properly withheld as privileged, and that the privilege was not waived due to disclosure to third parties. The parties to whom the emails were directed were part of the Offutt organization or an employee of a wholly owned subsidiary of Offutt. The email communications involved legal advice about ongoing litigation. In this case, it would appear that the associational privilege doctrine or the common interest doctrine would be sufficient grounds to maintain the attorney-client privilege. *See* Section 7, below. The motion to compel is denied with respect to these eight documents.

4. **Communications Made for a Purpose Other Than Obtaining or Providing Confidential Legal Advice – Potandon, Orrick Defendant Driscoll**

A. *Potandon*

Potandon argues the documents identified in Appendix A, category 4, are privileged under the common interest doctrine. It asserts that the identified documents constitute communications between Potandon and the cooperatives about the formation and structure of entities seeking to take advantage of Capper-Volstead Act immunity, and

contain "legal advice" regarding compliance with the Act. The Court will address this category of documents in its discussion about the common interest doctrine in Section 7, below.

### B. *Orrick*

In their response brief, Orrick Defendants Larson and Driscoll indicate this dispute was resolved with Plaintiffs. The Court therefore will not address it. Larson Brief at 2 (Dkt. 569).

## 5. Failure to Identify Attorney as Party to Communication – Andersen Defendants UPGI, United II, Raybould, and Wada

Plaintiffs argue the Andersen Defendants noted above failed to demonstrate an attorney-client relationship existed between members of the cooperatives and the attorney for the cooperatives, which included attorney Randon Wilson, for certain communications included on their privilege logs. Plaintiffs identify communications on the privilege logs for these Andersen Defendants circulated among members of UPGI, UPGA, Raybould, Wada, and United II with Randon Wilson, the cooperatives' attorney. *See* Appendix A, category 5 (Dkt. 540-1.) Second, Plaintiffs contend the privilege logs fail to establish whether the communications were intended to remain, or were in fact kept, confidential.

Defendants contend that these Andersen Defendants had an attorney-client relationship with Randon Wilson in their capacity as members of the cooperatives represented by Mr. Wilson. Defendants assert that the cooperatives were akin to corporations, and assert the cooperative members therefore had the ability to

communicate and share their communications among members of UPGI, UPGA, and United II, and Mr. Wilson. Defendants have provided the Court with the documents reflecting communications falling in this category for in camera review.

Upon review of the communications in camera, the Court concludes these Andersen Defendants have not carried their burden in establishing the communications are privileged. First, with regard to any documents in category 5 previously identified in category 1 for which the Court ordered production, Defendants may not claim the privilege separately here. These documents include UPGI documents 63, 182, 207, and 208; United II documents Priv 4 and 15; Raybould 1583; and Wada Priv. 16, 376, 415, 423, 441, and 442. *See* Appendix A, category 5 (Dkt. 540-1.)

Second, upon review of the documents submitted in camera, it appears that the individuals seeking Mr. Wilson's advice were not necessarily doing so in their capacities as members of a cooperative. Rather, the communications are replete with requests for Mr. Wilson's thoughts about a particular subject, and once received, the communications were shared among other entities such as Wada, Raybold, Cornelienson, Driscoll, and others. There are also emails between Wada and Mr. Wilson giving the attorney a "heads up" about actions Wada and others had taken, for the purpose of ascertaining how these actions might affect the cooperatives. In other words, the communications did not involve just the business or operations of the cooperatives. Rather, the interrelated entitites shared the information given to or received from Randon Wilson, disseminated it to others the Court often cannot identify from the email addresses, and otherwise did not treat the communications or information as confidential. And, other emails in this category appear

to be asking Mr. Wilson for general business advice in his capacity as a Capper-Volstead expert---not as an attorney for one of the cooperatives.

An analogy the Court likens this to would be if grocers such as Winco and Albertsons formed and were members of a national grocery cooperative, and decided to seek the advice of the cooperative's attorney regarding pricing. That attorney is neither Winco's nor Albertsons' attorney. Assume the communications between Winco and Albertsons representatives as members of the cooperative sought advice outside the activities of the cooperative, such as advice relating to how Winco and Albertsons conduct their businesses in relation to the cooperative. Then, the information is shared and discussed by Winco, Albersons, and other grocers. Under those facts, there is no intent the information would remain confidential. Put differently, there is no indication that the "client," in this case the cooperative (through its member(s)), sought information from the attorney for the cooperative in confidence and limited disclosure to third persons for whom disclosure was necessary for the accomplishment or purpose for which the attorney was consulted. Rather, the information was shared by and among various entities for purposes other than strictly the cooperative's business. The attorney-client privilege does not extend to communications about a joint business strategy between or among different entities, even if the communications happen to include a concern about potential litigation. *FSP Stallion 1, LLC v. Luce*, 201 WL 3895914 *18 (D. Nev. Sept. 30, 2010).

The Court concludes that the privilege does not attach to the communications identified on Appendix A, category 5, and to the extent it may have attached initially, it was waived.

**6.** **Failure to Establish Communications Were Within the Scope of An Attorney-Client Relationship – Orrick Defendant Driscoll; Potandon**

**A.** *Orrick*

There are several documents in Appendix A, category 6, identified also in category 1 that the Court ordered produced in its prior order. Although the documents are repeated in category 6, they are subject to production under the Court's order finding the attorney client privilege was waived because of Orrick's advice of counsel affirmative defense. These documents are numbers 546, 549, 576, 579, 581-583, 600, 610, 611, 765-769, and 829.

Regarding the remaining documents identified in category 6 on Appendix A, it appears the communications were between the Driscolls, who were members of IFC (Idaho Fresh Cooperative) and NFC (National Fresh Cooperative), and Mr. Randon Wilson,[3] who represented IFC and NFC as the organizations' attorney. *See* Decl. of Rinkema Ex. P (Dkt. 569-18.) IFC dissolved in September of 2006, and NFC began its operations in September of 2006. Loraine Driscoll was the president of IFC, and then NFC, up through July of 2010. *Id.* Orrick Defendants represent that the documents reflect Mr. Wilson's advice as attorney for IFC or NFC, sought by or given to Ms. Driscoll or other officers or directors of IFC or NFC. *Id.* Ex. Q. Plaintiffs contend that Orrick Defendants have not established these communications occurred within the scope of an attorney-client relationship, because the communications were between counsel for the association and its members.

---

[3] The Court is familiar with Mr. Wilson's representation of the cooperatives and his role in this litigation.

First, the privilege logs are inadequate. The Court has had to parse the above

information by reading the email attachments to the Rinkema Declaration, and reviewing

the email exchanges between the attorneys to this dispute. The facts described above are

not apparent from the privilege logs themselves. And, if these communications were

between Loraine Driscoll (and others) in her capacity as association president of IFC, and

later NFC, and the associations' attorney, Mr. Wilson, it is unclear why they appear on

Orrick Defendant Driscoll's privilege log. The Court is left to question whether Ms.

Driscoll, in her dual capacity as association president and owner of Driscoll Potatoes,

Inc., had an ulterior motive for seeking or receiving the advice. Further, Orrick Defendant

Driscoll did not explain Ms. Driscoll's dual role, or why the documents are included on

Driscoll's privilege log.

Second, IFC apparently has dissolved and no longer operates. The attorney-client

privilege should be applied only when necessary to achieve its limited purpose of

encouraging full and fair disclosure by the client to his or her attorney. *Lopes v. Vieira*,

688 F.Supp.2d 1050, 1068 (E.D. Cal. 2010). A dissolved corporation, or in this case,

association, has less need for the protections provided by the privilege than a natural

person would need. *Id.* (quoting *City of Rialto v. United States Dep't of Defense*, 492

F.Supp.2d 1193, 1200-01 (C.D.Cal.2007)). In *Lopes*, following the reasoning of *Rialto*,

the court found that a dissolved limited liability company that carried out no ongoing

business lost its ability to invoke the attorney-client privilege. *Id.* at 1068-69. Here, IFC

has dissolved, and Ms. Driscoll is no longer its President. It is not clear how Ms. Driscoll,

as an owner of Orrick Defendant Driscoll, can assert the privilege on behalf of Mr. Wilson's client, IFC, which no longer exists.

Turning now to NFC, again, it is not clear how Orrick Defendant Driscoll and Ms. Driscoll, who no longer appears to be NFC's president, can assert the privilege on behalf of NFC. It bears repeating that Orrick Defendant Driscoll has not explained why these communications are retained in Orrick Defendant Driscoll's files. Like Potandon, Orrick Defendant Driscoll may have had a common interest in seeking the advice from Mr. Wilson, ostensibly in Ms. Driscoll's capacity as NFC president, but perhaps not. Mr. Wilson, the attorney from whom the advice was sought and given, was not Orrick Defendant Driscoll's attorney. Yet, the information was shared with Driscoll's attorney Dave Gallafent, and another attorney, Ryan Peterson, whose representational capacity is not identified. *See e.g.* Priv. 602, attachment authored by Ryan Peterson to email chain containing legal advice from Randon Wilson, shared by Loraine Driscoll with Gabriel Boldt and Tyler Driscoll. (Dkt. 541-1 at 101.)[4] Other documents are shared as well.[5]

Ultimately, it was Orrick Defendant Driscoll's burden to persuade the Court the privilege applies to the IFC and NFC documents in category 6. They have not done so. There is no adequate explanation for the above issues. The documents must be produced.

---

[4] Orrick Defendant Driscoll has not explained who Gabriel Boldt or Tyler Driscoll were at the time of these communications. The communication from Mr. Wilson to Ms. Driscoll was shared with these individuals.

[5] *See e.g., Priv.* 589, from Rdale Price to Curtis Looslie, Taylor McLaren, Russ Leonardson, Gabriel Boldt and copied to Loraine Driscoll, Dirk Driscoll, Jeff Pahl, Jack Poulson, Keith Erikson, Carl Taylor, and Dave Robison, which shared an email discussing the draft packing agreement with NFC and containing advice "of counsel Randon Wilson." Driscoll Potatoes Privilege Log (Dkt. 541-1 at 99.)

**B.      *Potandon***

Potandon contends that the common interest doctrine applies to protect the documents identified on Appendix A, category 6, from production. Potandon argues that the communications at issue, although not made in anticipation of litigation, fall within the common interest doctrine because the parties to the communications shared a common legal interest to meet legal requirements and plan their conduct accordingly. The Court will address this category of documents in its discussion about the common interest doctrine in Section 7, below.

**7.      Common Interest Privilege – Potandon and Offutt Defendants**

Plaintiffs argue that entries on the privilege logs for Defendants Potandon and Offutt cite the common interest privilege as the basis for withholding the documents, but the privilege does not apply because the communications occurred prior to the commencement of litigation, and relate to business strategies.

The common interest privilege, or joint defense privilege, is an extension of the attorney client privilege. *U.S. v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012). The privilege applies  if "(1) the communication is made by separate parties in the course of a matter of common [legal] interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D.Cal. 2007).

The rationale for the rule is to allow "persons who share a common interest in litigation [to] be able to communicate with their respective attorneys and with each other

to more effectively prosecute or defend their claims." *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990). Although the privilege is not limited to situations in which litigation has commenced or is in progress, there must be some common legal effort in furtherance of anticipated litigation. *In re Grand Jury Subpoenas,* 902 F.2d at 249; *U.S. v. Schwimmer*, 892 F.2d 237 244 (2nd Cir. 1989); *Gonzalez*, 669 F.3d at 980; *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D.Cal. 2007).

But the doctrine does not extend the privilege to communications about a joint business strategy that happens to include a concern about litigation. *FSP Stallion 1, LLC v. Luce*, 201 WL 3895914 *18 (D. Nev. Sept. 30, 2010). In practice, the parties must demonstrate cooperation in formulating a common legal strategy. *Id.* And, even if the parties do share a common legal interest, for the privilege to apply, the communication at issue must be designed to further that legal effort. *Id.* "The fact that the parties may have been developing a business deal that included a desire to avoid litigation 'does not transform their interest and enterprise into a legal, as opposed to a commercial matter.'" *Id*. (quoting *Bank of Am. v. Terra Nova Ins. Co., LLT*, 211 F.Supp.2d 493, 497 (S.D.N.Y. 2002)).

### A. *Potandon*

Potandon argues it is a "marketing agent in common" ("MAIC") under the Capper-Volstead Act, and to maintain its status as a MAIC it must comply with a variety of legal issues regarding its structure and marketing agreements with the cooperatives for which it sells potatoes. Potandon argues that each of the cooperatives share the same legal interest with Potandon. Potandon identifies the shared legal interest as "ensuring

that Potandon's structure and marketing agreements comply with the Capper-Volstead Act's requirements." Potandon Response at 3 (MDL Dkt. 570.) Potandon explains that its lawyers "sometimes coordinate with lawyers for each of the cooperatives" so they can "assess and discuss whether certain business decisions and arrangements have legal consequences that affect all of their common interest under the Act." Potandon argues that there is no waiver of the attorney-client privilege when it shares communications containing legal advice, if the legal advice "concerns the parties' common legal interest in structuring their entities and business relationships to comply" with the Act.

Potandon claims that the documents identified on Appendix A, in categories 3, 4, 6, and 7, are all privileged pursuant to the common interest doctrine. The Court disagrees. Accepting Potandon's characterization of the interest it shared with the cooperatives, and its "collaborative effort" to maintain compliance with the Capper-Volstead Act, the "mere fact that the parties were working together to achieve a common commercial goal cannot by itself result in an identity of interest between the parties." *Terra Nova*, 211 F.Supp. 2d at 497.

The fact they may have had a shared desire to maintain compliance and avoid litigation also does not transform the cooperatives' common interest with Potandon "into a legal, as opposed to commercial, matter." *Id.* Although Potandon characterizes the interest it shared with the cooperatives as a "legal" interest, naming it as such does not transform its business interest into a legal interest for purposes of the common interest doctrine. There is no evidence of any concern regarding pending or threatened litigation raised during the time period of these communications. Even if there was a general

consensus to avoid litigation by maintaining compliance with Capper-Volstead, "a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule." *In re FTC*, 2001 WL 396522 *5 (S.D.N.Y. April 19, 2001).

Turning first to the documents identified in Appendix A, category 4, Potandon describes them as communications between Potandon and the cooperatives containing legal advice about the formation and structure of entities seeking to take advantage of Capper-Volstead immunity. These documents include communications to third parties containing legal advice about the parties' membership agreements, contracts, and memoranda of understanding with members of cooperatives and non-members. These documents fall outside of the common interest doctrine under the standards the Court has articulated. The communications are general legal advice, shared with third parties, about the parties' joint business strategies. The common interest doctrine does not extend the privilege to such communications. *FSP Stallion 1, LLC*, 2010 WL 3895914 at *21 ("The common interest doctrine does not extend to communications about a joint business or financial transaction, merely because the parties share an interest in seeing the transaction is legally appropriate.").

Potandon treats the documents identified in Appendix A, categories 3, 6, and 7 together. It argues that the documents in these three categories were communications shared with the cooperatives containing legal compliance advice provided in anticipation of litigation. Potandon did not identify specific litigation, or even this litigation. Nebulously, Potandon identifed only the "prospect of litigation" and the parties' joint

desire to maintain immunity under the Capper-Volstead Act. The documents apparently contain advice about how to structure the relationships between Potandon, a MAIC, and the cooperatives for which it markets.

Potandon cites several cases in support of its argument that communications need not have been made in anticipation of litigation to fall within the protection of the common interest doctrine. The cases cited are distinguishable. For example, Potandon cites *U.S. v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987),[6] for the proposition that the common interest privilege applies even if a non-party to the communication has not been sued and faces no immediate liability. However, in that case, the government was investigating L. Ron Hubbard, of the Church of Scientology, for criminal tax fraud. The communications at issue were between Mr. Hubbard and his attorneys, and nonlawyers were present at the meeting. These third parties were all members of the Church, and had a common interest in sorting out the affairs of the Church and Mr. Hubbard in the context of the litigation; thus, the court found the communications were protected by the common interest doctrine even though the nonlawyers were not part of the litigation. *Zolin*, 809 F.2d at 1417. However, litigation had commenced, and the government sought disclosure of the communications during the course of its investigation of Mr. Hubbard for criminal tax fraud. Such is not the case here, where the communications were not shared with third parties in the context of any specifically anticipated or ongoing litigation.

---

[6] The Court of Appeals for the Ninth Circuit granted a rehearing, and withdrew the opinion cited above in *U.S. v. Zolin*, 832 F.2d 127 (9th Cir. 1987), and later vacated that order, instructing only that the portion of the three-judge panel opinion in *U.S. v. Zolin*, 809 F.2d 1411 (9th Cir. 1987), beginning with "the first full paragraph on page 1418 to and including the last full paragraph in the second column on the same page is withdrawn." *U.S. v. Zolin*, 842 F.2d 1135, 1136 (9th Cir. 1988).

Potandon relies heavily upon *Hewlett-Packard Co. v. Baush & Lomb, Inc.*, 115 F.R.D. 308, 309-312 (N.D. Cal. 1987), in support of its argument that litigation need not be commenced for the common interest privilege to apply. Potandon contends that the court in *Hewlett-Packard* reasoned "that because both parties could potentially have to defend against an infringement suit at some indefinite point in the future, the parties had a common legal interest sufficient for the privilege to apply." The statement is true so far as it goes. In that case, the issue was whether Bausch & Lomb waived its right to withhold documents under the attorney-client privilege, the work product doctrine, or both, when it voluntarily disclosed its attorney's opinion letter to a non-party with whom it was negotiating the sale of a business. There, however, the letter actually involved the threat of impending litigation. If the third party entered into the business deal, Bausch & Lomb wanted it to be clear that both of them likely would be sued by Hewlett-Packard. In other words, the threat of litigation rose to a level greater than a mere desire to avoid the remote possibility of litigation---both parties "anticipated litigation in which they would have a common interest." *Hewlett-Packard Co.*, 115 F.R.D. at 310.

Potandon also cites *Pulse Engineering, Inc. v. Mascon, Inc.*, 2009 WL 3234177 at *3 (S.D. Cal. Oct. 2, 2009), for the proposition that communications mixing both business-related content and legal concerns do not lose protection of the privilege. In *Pulse*, however, actual litigation was commenced between the parties. Further, the court's review of the communications at issue revealed that defense counsel directed the communications to the third party, which party shared the defendant's interest in the pending litigation, and the communications were for the purpose of conducting tests

required for the pending litigation. *Pulse*, 2009 WL 3234177 at *3. Therefore, although the communications involved a shared commercial interest, the communications were related to the parties' shared interest in conjunction with the lawsuit.

In all of the cases relied upon by Potandon, it is clear to the Court that the threat of impending litigation, or actual litigation, was involved. Yet Potandon seeks to stretch the bounds of the common interest doctrine too far. It acknowledges that there was no threat of litigation at the time the communications were shared, just a common desire to remain in compliance with the Capper-Volstead Act. The communications therefore involve legal compliance advice merely to remain compliant with the Act.

Consequently, the relationship between Potandon and the cooperatives with which it shared information is distinguishable from the cited cases. In each of those cases, the court found a common legal interest because the communications were made to advance a joint legal strategy concerning either separate litigation involving similar claims and issues or reasonably anticipated joint litigation. In *Pulse*, *Hewlett-Packard* and *Zolin*, the litigation had already commenced or was very likely to occur, and the third parties to whom the privileged information was disclosed shared a common goal in connection with the identified litigation or litigation threat. Here, in contrast, Potandon and the cooperatives merely desired to structure their business relationships to remain compliant with the Capper-Volstead Act and avoid the potential of litigation.

Plaintiffs' motion to compel directed at Potandon with respect to the documents identified in Appendix A, category 3, 4, 6, and 7, or to any other documents claimed to be protected by the common interest doctrine under the grounds Potandon advances here, is

granted. Communications containing legal advice regarding Potandon's general business

relationships with the cooperatives, and shared by Potandon with the cooperatives, must

be produced.

### B.    *Offutt*

Offutt explains that the documents identified on Appendix A in category 7 (Dkt.

540-1) are subject to a different aspect of the privilege—the common interest and

associational privilege. The Affidavit of Paul Noah establishes he is general counsel for

Offutt and RDO Equipment Company. (Dkt. 567-2.) In that role, Mr. Noah represents the

wholly owned subsidiaries of Offutt and RDO Equipment Company, which include RDO

Frozen Co., Ag Capital Company, RDO Agriculture Equipment Co. and RDO

Construction Equipment Co. (Dkt. 567-2.) Part of Mr. Noah's job involves also serving

as counsel to Offutt's partially owned subsidiary, Idahoan. Offutt and its wholly owned

subsidiaries together own 51.0541% of Idahoan. *Id.* ¶ 5.

The documents listed on the privilege log Plaintiffs seek to compel include: (1)

communications between Paul Noah and Idahoan employees; and (2) communications

involving employees of both Offutt and Idahoan, and counsel for one or both entities. As

to the first category of documents, Offutt argues they are communications between

attorney and client, and subject to the privilege. Further, Offutt argues Idahoan is the

entity that "owns" the privilege. For the second category of documents, Offutt invokes

the associational privilege because Idahoan is a subsidiary of Offutt. Plaintiffs complain

that the privilege logs lack the identity of the individuals to whom the documents were

disclosed, their positions, and their reason for needing to know the information. *See U.S. v. Witmer*, 835 F.Supp. 208, 223 (M.D. Pa. 1993).

The "associational privilege" protects communications made by corporate employees to counsel for the corporation, at the direction of corporate superiors to secure legal advice from counsel, provided the employees were aware they were being questioned so the corporation could obtain legal advice. *Upjohn Co. v. U.S.*, 449 U.S. 383, 394 (1981). The communications do not necessarily have to involve anticipated litigation, but they must be for the purpose of securing legal advice to the company. *Upjohn*, 449 U.S. at 395-6. The associational privilege is not a separate privilege but an extension of the attorney-client privilege. *Id.* All other conditions of the attorney-client privilege must be met. *MGA Entertainment, Inc. v. Nat'l Prods. Ltd.*, 2012 WL 3150532 *3 (C.D. Cal. Aug. 2, 2012).

In *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Ariz.*, 881 F.2d 1486, 1493 n.6 (9th Cir. 1989), the court in dicta explained that, under *Upjohn*, "communications between employees of a subsidiary corporation and counsel for the parent corporation, like communications between former employees and corporate counsel, would be privileged if the employee possesses information critical to the representation of the parent company and the communications concern matters within the scope of employment." But the mere existence of an affiliate relationship does not excuse a party from demonstrating the applicability of the attorney-client privilege. *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 474 (S.D.N.Y. 2003).

Common ownership or control may relax the standard somewhat, but to be treated as one entity for attorney-client privilege purposes, the corporation must either be closely affiliated or share an identity of legal interest. *Music Sales Corp. v. Morris*, 1999 WL 974025 *7 S.D.N.Y. (Oct. 26, 1999).[7] In *Music Sales*, the court held that the communications between two wholly owned subsidiaries of a third parent corporation, which operated "in effect, as a single entity, … need not establish a substantial identity of legal interest" to assert the attorney-client privilege over communications shared between the subsidiary corporations. *Id.*

The problem with Offutt's reliance upon the holding in *Music Sales*, however, is that Offutt has not shown that Idahoan operates as a "single entity" with a unity of interest such that it can be treated as if it was one and the same as Offutt. Offutt, together with its *subsidiaries and affiliates collectively* own 51% of Idahoan. A collective ownership of 51% is not equivalent to a wholly owned subsidiary, like the two corporations considered in *Music Sales*. Offutt wants the Court to extrapolate, based upon the 51% collective ownership and the "sharing" by Offutt and Idahoan of Mr. Noah as an attorney, that the two corporations should be treated as one for purposes of the attorney-client privilege. But the sharing of an attorney is not the equivalent of establishing the entities themselves operate as a single entity with a unity of interest.

---

[7] Offutt cited also *Miller v. Internat'l Bus. Machines*, 2006 WL 1141090 (N.D. Cal. 2006) as "taking the *Admiral* rule further," and in support of its argument that a parent corporation and a wholly owned subsidiary should be treated as a single entity for purpose of determining attorney client privilege. But *Miller* did not involve the application of the attorney-client privilege. In that case, the issue was whether IBM had sufficient control over documents possessed by its Chinese affiliate companies such that the plaintiff could obtain them through its production requests served upon IBM. The court held that, although IBM had control over its Chinese subsidiaries, neither IBM nor the subsidiary companies were responsible for responding to plaintiff's discovery requests. 2006 WL 1141090 *3. The court did not discuss application of the attorney-client privilege.

Offutt cites one sentence from *Gulf Islands* as support for its argument that sharing an attorney is sufficient to uphold the common interest rule. Offutt Brief at 11 (Dkt. 567.) In *Gulf Islands*, the court explained:

> Some cases state the broad proposition that disclosure of attorney-client privileged information to an affiliated company does not waive the privilege—thereby obviating the need to invoke the common interest rule. *See, e.g., Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2000 WL 1800750, at *6 (S.D.N.Y. Dec. 7, 2000); *Music Sales Corp. v. Morris*, 1999 WL 974025, at *7 (S.D.N.Y. Oct. 26, 1999); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1185 (D.S.C.1974), *aff'd*, 540 F.2d 1215 (4th Cir.1976). <u>But it appears that in such cases no waiver was found because the entities were represented by a common attorney</u>, *see Cary Oil*, 2000 WL 1800750, at *3–6, or shared a common legal interest. *See Music Sales*, 1999 WL 974025, at *3; *Duplan*, 397 F.Supp. at 1184. In this case, however, Bombardier Capital and Bombardier Aerospace utilized different attorneys and held different interests of a commercial, not legal, nature.

*Gulf Islands*, 215 F.R.D. at 474 (emphasis added). However, a closer look at *Cary Oil*, the case cited in *Gulf Islands*, reveals that the holding hinged upon more than just a shared attorney. Rather, the communications at issue in *Cary Oil* were between a wholly owned subsidiary and its attorney, which communications were then shared with the corporation's parent company. 2000 WL 1800750 at *6. The court found no waiver of the attorney-client privilege under such circumstances. *Id.*

The Court declines to extend the *Admiral* rule to the relationship between Idahoan and Offutt. Idahoan may be controlled by Offutt and its subsidiaries, but Idahoan is not a wholly owned subsidiary of Offutt. Idahoan uses Offutt's attorney, Mr. Noah, to provide legal advice, but that appears to be as far as the relationship goes.

As examples, Priv. 00584 and 585 are emails from Idahoan employees to Mr. Noah in his capacity as counsel for Offutt, and they are described as "communications with counsel with shared interest in drafting contract related to Idaho Fresh-Pac agreement." Another example is Priv. 666-669, described as emails with counsel "regarding draft potato storage lease for a potato storage barn in Grand Forks. Common interest with RDO and Idahoan due to need to store raw potatoes before processing." Offutt represents that these communications are exchanges by employees or other executives to or from Mr. Noah in his capacity as counsel for both the parent corporation and subsidiary corporation. However, the Court finds that this group of documents is not protected from production, as the associational privilege does not extend to the communications in this category.

Plaintiffs next seek to compel production of communications between Paul Noah and Idahoan employees. Offutt explains that these documents were not shared outside of Idahoan. Offutt argues that Mr. Noah was acting in his role as corporate counsel for Idahoan and therefore these communications should be protected from disclosure. Offutt argues also that the privilege is owned by Idahoan, and that Offutt is not the proper party to address the motion to compel. Many of these same documents, Offutt explains, appear on Idahoan's privilege log, and were captured by the production requests to Offutt because Mr. Noah did not separate his email accounts. As an example, Priv. 582 is described as an email with counsel regarding the drafting of the Idahoan HCP supply agreement, from an employee within Idahoan to Mr. Noah.

With regard to communications between Paul Noah and Idahoan employees, the Court finds the attorney-client privilege would apply, and the communications would be protected from production. There is no indication that Mr. Noah, in his capacity as counsel for Idahoan, waived the privilege and shared the documents with Offutt employees or officers. Plaintiffs did not direct their motion to compel to Idahoan, even though many of the same documents apparently are disclosed on Idahoan's privilege log. The privilege belongs to the client---in this case, Idahoan---and not to Offutt, or Mr. Noah, who was acting in his role as Idahoan's corporate counsel. *See U.S. v. Doe*, 429 F.3d 450, 452 (3rd Cir. 2005) (privilege belongs to the client, not to the attorney). The motion is denied concerning documents reflecting communications exclusively between Paul Noah and Idahoan employees in Paul Noah's role as Idahoan's corporate counsel.

Offutt did not separate the documents on its privilege log belonging to one or the other category of documents it referenced. Offutt is directed to produce the documents shared between Idahoan and Offutt for which both companies sought Mr. Noah's advice, but may retain as privileged those documents reflecting communications exclusively between Idahoan and its employees with Mr. Noah.

## 8. Defendants Improperly Asserted Privilege on Behalf of Third Party – Potandon, Offutt Defendants

### A. *Potandon*

The second category of documents for which Plaintiffs seek to compel production from Potandon are documents Potandon identifies as personal communications culled from the files of Brit White, a Potandon custodian, created during his past employment

with IFC. *See* Appendix A, category 8 (Dkt. 540-1.) Plaintiffs assert that Potandon improperly claims the privilege on behalf of a third party. But Potandon explains that Mr. White's personal email account, which he sometimes used for business purposes, was subject to the parties' production requests under the terms of the Court's ESI order, and there was no intent (or authority) by Potandon to waive the privilege possessed by Mr. White's former employer, IFC. Potandon represents that the emails were created by Mr. White in his capacity as an attorney for IFC during the time of his employment with IFC.

Potandon is correct that the emails between Mr. White and his former employer, Idaho Fresh Cooperative (IFC), are privileged. Mr. White, a past employee of IFC, lacks the authority to waive IFC's attorney-client privilege, and the power to waive it rests with IFC. *U.S. v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996). *See also U.S. v. Doe*, 429 F.3d at 452. Plaintiffs' motion to compel is denied with respect to the documents identified in Category 8 of Appendix A pertaining to Mr. White.[8]

### B.    *Offutt*

Offutt does not address the eight documents Plaintiffs identified on Appendix A category 8 in its brief. Rather, Offutt complains that Plaintiffs did not raise the issue in their motion, and referenced only Potandon in the motion, so Offutt "assumes Plaintiffs have abandoned this section in Appendix A as far as it applies to Offutt and thus no response is necessary." The Court makes no such assumption. Plaintiffs took the time to

---

[8] *But see* Section 6, supra. There, the Court discussed the implications of the shared communications between Ms. Driscoll, association president of IFC (which no longer operates), and Orrick Defendant Driscoll as well as other third parties. Conversely, it does not appear that Mr. White shared the communications at issue in section 8.

include eight documents on Appendix A. That Plaintiffs may not have directly addressed them in their brief is inconsequential given the magnitude of the motion.

The Court reasons, based upon *Chen*, that the same argument applied above regarding Mr. White's emails applies to these eight documents. Offutt, perhaps out of an abundance of caution, identified these eight documents because they were captured as part of the broad production requests. But, Offutt was not improperly asserting the privilege on behalf of a third party, and instead was preserving the third party's right to have its attorney-client privileged materials remain so. The privilege belongs to the client, and it is not Offutt's to waive.

# CONCLUSION

Based upon the above analysis, and utilizing Plaintiffs' Appendix A (Dkt. 540-1) as a guide, the following chart summarizes the Court's order and constitutes the final resolution of Plaintiffs' Motion to Compel: [9]

| Deficiency | Log/Defendant | Court Order on Motion to Compel |
|---|---|---|
| 1. The Stipulating Defendants have waived the attorney-client privilege as to communications relating to their affirmative defenses | Defendant United Potato Growers of Idaho, Inc.'s Fourth Amended ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Defendant United Potato Growers of Idaho, Inc.'s Second Amended Non-ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Defendant United Potato Growers of America, Inc.'s Third Amended ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Defendant United Potato Growers of America, Inc.'s Second Amended Non-ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Defendant United II Potato Growers of Idaho, Inc.'s Revised ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to |

---

[9] The Court issued an order regarding Categories 1 and 2. Their inclusion here does not intend to invite additional briefing or further objection.

| | | |
|---|---|---|
| | | Compel, MDL Dkt. 625) |
| | Defendant Raybould Brothers Farms, LLC's Fourth Amended ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Defendant Raybould Brothers Farms, LLC's Second Amended Non-ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Defendant Snake River Plains Potatoes, Inc.'s Amended Non-ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Wada Defendants' Fourth Amended ESI Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Blaine Larsen and Blaine Larsen Farms, Inc.'s Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| | Driscoll Potatoes, Inc.'s November 13, 2013 Privilege Log | **GRANTED** (*See* May 8, 2014, Order MDL Dkt. 638 Overruling objection and Affirming April 11, 2014 Order Granting Motion to Compel, MDL Dkt. 625) |
| 2. The RDO Defendants have waived the attorney-client privilege as to communications relating to their affirmative defenses | R.D. Offutt Company and Ronald D. Offutt "ESI" and "Paper Docs" Privilege Logs | **DENIED** (*See* April 11, 2014 Order re: Motion to Compel, MDL Dkt. 625) |

| 3. Defendants have waived the attorney-client privilege by voluntary disclosure of communications to third parties | Potandon Produce, L.L.C. Second Revised Privilege Log | **GRANTED** |
|---|---|---|
| | Driscoll Potatoes, Inc.'s November 13, 2013 Privilege Log | **GRANTED** |
| | Defendant United Potato Growers of America, Inc.'s Second Amended Non-ESI Privilege Log | **DENIED** |
| | R.D. Offutt Company and Ronald D. Offutt "ESI" and "Paper Docs" Privilege Logs | **DENIED** |
| 4. Communications made for a purpose other than obtaining or providing confidential legal advice are not protected by the attorney-client privilege | Potandon Produce, L.L.C. Second Revised Privilege Log | **GRANTED** |
| | Driscoll Potatoes, Inc.'s November 13, 2013 Privilege Log | **MOOT** |
| 5. Defendants' privilege log entries that fail to identify an attorney as a party to the communication are not protected by the attorney-client privilege | Defendant United Potato Growers of Idaho, Inc.'s Fourth Amended ESI Privilege Log | **GRANTED** |
| | Defendant United II Potato Growers of Idaho, Inc.'s Revised ESI Privilege Log | **GRANTED** |
| | Defendant Raybould Brothers Farms, LLC's Second Amended Non-ESI Privilege Log | **GRANTED** |

| | Wada Defendants' Fourth Amended ESI Privilege Log | **GRANTED** |
|---|---|---|
| 6. Defendants have failed to establish that communications took place within the scope of an attorney-client relationship, including communications between counsel for an association and members of the association | Driscoll Potatoes, Inc.'s November 13, 2013 Privilege Log | **GRANTED** |
| | Potandon Produce, L.L.C. Second Revised Privilege Log | **GRANTED** |
| 7. The Common Interest Privilege Does Not Apply to Defendants' Pre-Litigation Communications or [sic] | Potandon Produce, L.L.C. Second Revised Privilege Log | **GRANTED** |
| | R.D. Offutt Company and Ronald D. Offutt "ESI" and "Paper Docs" Privilege Logs | **GRANTED** for communications with Mr. Noah shared between Idahoan and Offutt; **DENIED** for communications between Idahoan and its employees and Mr. Noah. |
| 8. Defendants improperly asserting the privilege on behalf of a third party | Potandon Produce, L.L.C. Second Revised Privilege Log | **DENIED** |
| | R.D. Offutt Company and Ronald D. Offutt "ESI" and "Paper Docs" Privilege Logs | **DENIED** |

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

Direct Purchaser Plaintiffs' Motion to Compel (MDL Dkt. 539) is **GRANTED IN PART AND DENIED IN PART**.

The Court's Order resolves Plaintiffs' Motion to Compel (Dkt. 539) in its entirety.

Dated: **May 30, 2014**

Honorable Candy W. Dale
United States Magistrate Judge